**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------X

M.P.,

Plaintiff,

-against-

EDUCATION PLUS CORPORATION d/b/a THE FAMILY FOUNDATION SCHOOL; BETTY ARGIROS; EMMANUEL ARGIROS a/k/a MICHAEL ARGIROS; CINDY ARGIROS a/k/a "CINDY RAY"; JEFFREY BRAIN a/k/a JEFF BRAIN; NBT BANK, N.A.; NBT BANCORP INC.; SYSCO CORPORATION; SYSCO SYRACUSE, LLC; GREYHOUND LINES, INC.; FOUR WINDS, INC. d/b/a FOUR WINDS HOSPITAL; THE HANCOCK HERALD; KASOS CO FAMILY LP; KASOS ENTERPRISES LLC; CHAPEL HILL LAND HOLDINGS LLC; K9-5 INC.; EAGLE VALLEY SEARCH, RESCUE AND RECOVERY TEAM, INC. d/b/a EAGLE VALLEY SEARCH DOGS; HIGHLIGHTS FOR CHILDREN, INC.; BOYDS MILLS (FORMERLY THE HIGHLIGHTS FOUNDATION); NATIONAL ASSOCIATION OF THERAPEUTIC SCHOOLS AND PROGRAMS; VILLAGE OF HANCOCK, NEW YORK, individually and through the VILLAGE OF HANCOCK POLICE DEPARTMENT; TOWN OF HANCOCK, NEW YORK; DELAWARE COUNTY SHERIFF'S OFFICE; COUNTY OF DELAWARE, NEW YORK; and DELAWARE COUNTY BOARD OF SUPERVISORS,

Defendants.

Case No.:
3:26 -cv- 1866 (AJB/ML)

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

----------------------------------------------------------------------X

Plaintiff M.P., by her attorneys, Johannesen & Umana, P.C., for her Verified Complaint against Defendants, alleges as follows:

## PRELIMINARY STATEMENT

1. From no later than August 1990 through the school's 2014 closure, Defendants operated the Family Foundation School ("FFS") in Hancock, New York, disguised to the public, to parents, and to the hospitals and clinicians who referred children to it as a therapeutic boarding school for troubled adolescents. In reality, FFS confined the minor children placed in its custody, including

Plaintiff M.P., delivered to FFS directly from a psychiatric hospital at sixteen years of age in June 1996 and held there for approximately sixteen months, until the day after her eighteenth birthday in October 1997, under conditions of forced, uncompensated labor, punitive restraint and isolation, gender-based control and degradation, and the denial of psychiatric and medical care, while extracting tuition and charges, on information and belief approximately one hundred thousand dollars over the course of her enrollment, from Plaintiff's family, on the representation that a girl who had just been stabilized on lithium in a psychiatric hospital would receive, from psychiatrists FFS represented were on its staff, the licensed psychiatric and therapeutic treatment she never received. Immediately upon her arrival, Plaintiff was strip searched in a classroom adjoining the institution's office, by female students acting at staff direction, made to squat and cough while naked, and photographed before she had been permitted to dress. Rather than receive any genuine clinical treatment, Plaintiff was taken off the lithium on which she had been stabilized, was seen by the institution's psychiatrist at most once in sixteen months, and was made to perform sustained forced labor that included dish crew and waitstaff duty, cleaning crews, the stripping and waxing of the institution's floors, the cleaning of its office, snow shoveling, the carrying of rocks from one pile to another as a sanction, the regraveling of the road to the institution's chapel, the cleaning of its dumpster and garbage area, landscaping, painting, and staining across the campus, the construction of the trailers in which students were housed and of a deck outside her own, labor at the private homes of staff members and at the wedding of a staff member, the unloading of the institution's commercial food deliveries from the trucks of Defendant Sysco, and the staging of the campus before parents visited. As punishment, she was wrapped in blankets, bound with duct tape, and left in a room off the boot closet for days at a time without access to a toilet, on the first

occasion for five consecutive days, while the institution billed her parents one hundred fifty dollars for each such restraint under another description and videotaped each one.

2. This action arises in this District, where the Family Foundation School operated and where related actions arising from the same enterprise are pending, and in substantial part in the City of New York. The venture that confined Plaintiff reached into the City of New York to obtain her and to keep her: it obtained her through the referral of a Westchester County psychiatric hospital, from which it took her directly into its custody; it drew its payment from her family's Staten Island household; and when she fled to the City of New York, it reached into the City again, by means of the photograph it had taken of her on the day it stripped her and its report to the police, to have her seized at the Port Authority Bus Terminal in Manhattan, handcuffed, held, and then returned to Hancock to be stripped and searched a second time. Plaintiff was, in the plainest sense, trafficked out of the City of New York into a forced-labor operation in the Catskills, and trafficked out of the City a second time when she tried to get home.

3. FFS's unlicensed and abusive operation was already a matter of public record when Plaintiff arrived: in August 1990, the New York State Division of Alcoholism and Alcohol Abuse issued FFS a formal, public cease and desist order for operating without the license New York law required. Defendants continued to operate, enroll, and confine children, including Plaintiff, delivered to FFS nearly six years later, in open disregard of that order, while representing to Plaintiff's family that FFS was a qualified therapeutic institution staffed with psychiatrists to treat her.

4. Plaintiff came to FFS through a hospital that referred children to it. In 1996, Plaintiff, then sixteen, was an inpatient at two private psychiatric hospitals in Westchester County, New York,

Four Winds Hospital in Katonah and Stony Lodge Hospital in Ossining, where she had been stabilized on lithium prescribed by her treating psychiatrist, when, on information and belief, Four Winds recommended FFS to her family, or, in the alternative, Stony Lodge did; on information and belief, both hospitals regularly referred adolescent patients to FFS. FFS represented to Plaintiff's mother and stepfather, a physician, that psychiatrists were on its staff. Her mother drove her directly from the hospital to Hancock. Plaintiff went willingly, on the understanding that she was going to a boarding school at which she would be treated and would finish high school.

5. When Plaintiff fled the campus by night and reached New York City by bus, a police officer holding the photograph the institution had taken of her was waiting at the Port Authority Bus Terminal. She was handcuffed and held in a room at the terminal until her mother collected her. She slept in her own home that night for the first time in a year, and that night told her mother, for the first time, what was being done to her at FFS. Her mother, whom FFS had told that its students would lie and say anything to be taken out, drove her back to Hancock the following day, where she was strip searched again. She left FFS the day after her eighteenth birthday, without a diploma, and FFS then withheld her transcripts over a balance of approximately three hundred dollars, so that she could not return to high school.

6. FFS's control of Plaintiff was gendered from the first hour. The intake search made a sixteen-year-old girl strip naked, squat, and cough before staff, and photographed her before she could dress. For the entirety of her enrollment she was barred from any contact with male students, was prohibited from wearing makeup or jewelry, was subjected to dress-down sanctions directed at her appearance, was subjected by adult staff to sexually explicit conversation, and was placed on half portions when she gained weight. When she fled and was seized in New York City, she was returned to the institution and stripped and searched again. That conduct, directed at Plaintiff

because she was a girl, is the basis of Plaintiff's claim under the New York City Victims of Gender-Motivated Violence Protection Law, asserted in Counts XXV and XXVI.

7. Plaintiff was placed on blackout from all contact with male students for the entirety of her enrollment and from her family as a sanction, and was never permitted a home visit; the campus her parents saw on their visits had been cleaned and staged for them by the children. In the years after she left, Plaintiff attempted suicide three times, was hospitalized psychiatrically, and entered substance-abuse treatment seventeen times. She told no one what had been done to her until 2013.

8. Following FFS's 2014 closure, its principals, Defendants Emmanuel Argiros and Cindy Argiros, moved the enterprise's remaining assets, including the FFS real property itself, into family-controlled entities and the hands of a longtime friend and neighbor of the Argiros family at below-market value rather than preserve them to answer for the decades of conduct described herein, and thereafter remained silent even after that conduct was judicially confirmed at Paul Geer's 2025 federal criminal trial.

9. The evidence and testimony adduced in the 2025 federal criminal prosecution of former FFS staff member Paul Geer, convicted on March 3, 2025 after a two-week jury trial and sentenced on September 4, 2025 to 327 months in federal prison for sexually abusing and trafficking FFS students across state lines, revealed for the first time the coordinated, institutional, and enterprise character of the conduct at FFS across decades of its operation, including the deliberate destruction of student and abuse-complaint records by the Argiros family and the institution's practice of billing families a nightly charge for the isolation confinement it staffed with unpaid children, facts Defendants had concealed for decades. Plaintiff attended that trial in person. That disclosure, and the events described herein, gave rise to the filing of this action.

10. Plaintiff brings this action seeking compensatory damages, trebled where applicable under RICO, together with punitive damages, attorneys' fees, and costs as set forth herein.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) based upon Plaintiff's claims under 18 U.S.C. § 1962 (RICO), 18 U.S.C. §§ 1589, 1590, 1591, and 1595 (Trafficking Victims Protection Reauthorization Act), and 18 U.S.C. § 2255. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

12. This Court has independent jurisdiction pursuant to 18 U.S.C. § 1964(c), which confers federal jurisdiction over civil RICO claims.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and transactions giving rise to Plaintiff's claims occurred within the Northern District of New York. Specifically: (a) the Family Foundation School, the institution at which Plaintiff was confined, forced to labor, restrained, strip searched, and denied promised treatment, is located in Hancock, New York, within this District, and the principal conduct giving rise to Plaintiff's claims occurred there; (b) Plaintiff was delivered into the venture's custody in Hancock in June 1996, was returned to Hancock and strip searched a second time after she fled, and was held there until October 1997; (c) the tuition and charges giving rise to Plaintiff's RICO injury were transmitted to and processed within this District, through the enterprise's accounts at NBT Bank's Hancock branch; and (d) related actions arising from the same enterprise are pending in this District. Venue is additionally proper pursuant to 18 U.S.C. § 1965(a) and (b), because one or more Defendants reside in, are found in, have an agent in, or transact their affairs in this District, and the ends of justice require that the remaining Defendants, who are parties to a single enterprise and conspiracy,

be brought before this Court. The venture's conduct toward Plaintiff also reached into the City of New York, on which Plaintiff's claims under the New York City Victims of Gender-Motivated Violence Protection Law are founded in part: (e) Plaintiff was recruited into the venture through a referral made to her family, while she was an inpatient there, by Defendant Four Winds Hospital in Katonah or, in the alternative, Stony Lodge Hospital in Ossining, both in Westchester County, and was transported into the venture's custody directly from that hospital; (f) when Plaintiff fled the venture, she was seized at the Port Authority Bus Terminal in New York County, by means of the photograph the venture had taken of her and supplied to law enforcement, was handcuffed and held there, and was transported from the City back into the venture's custody, where she was strip searched again; (g) the tuition and charges giving rise to Plaintiff's RICO injury were paid from her family's household in the City of New York and transmitted from the City to the enterprise's accounts; and (h) Plaintiff resided in the City of New York at the time of her enrollment.

14. This Court has personal jurisdiction over each Defendant because each Defendant resides in, is organized under the laws of, maintains offices or operations in, or transacted business in the State of New York, and because each Defendant committed acts and omissions giving rise to Plaintiff's claims in the State of New York, including acts directed at and consummated within the City of New York.

15. Plaintiff proceeds in this action under her initials. This Complaint describes psychiatric hospitalizations, a history of sexual assault, the strip searching and photographing of Plaintiff as a minor, suicide attempts, and substance-abuse treatment, the public association of which with her name would injure her. Plaintiff's identity will be disclosed to Defendants under an appropriate protective order, and Plaintiff will move for leave to proceed under a pseudonym.

## THE PARTIES

### Plaintiff

16. Plaintiff M.P. is an adult individual, born in October 1979, who was enrolled at FFS from June 1996 through October 1997, arriving at sixteen years of age and departing, on the day after her eighteenth birthday, at eighteen. Plaintiff was raised on Staten Island, in the City of New York, and currently resides in the State of Florida.

17. Prior to her placement at FFS, Plaintiff had been expelled from two schools, had broken curfew, and had drunk alcohol, but was not addicted to any substance. Plaintiff had also suffered sexual assault before her enrollment, a trauma that required treatment. In 1996, Plaintiff was admitted to two private psychiatric hospitals in Westchester County, New York, Four Winds Hospital in Katonah and Stony Lodge Hospital in Ossining, where she was stabilized on lithium, which, on information and belief, her treating psychiatrist had prescribed before or during those admissions. Stony Lodge Hospital has since closed. Her mother, a nurse, believed that FFS had the ability and the qualifications to treat adolescent substance use and placed Plaintiff there in order to be proactive about her care. Plaintiff was sent to FFS for the express purpose of continuing the psychiatric treatment she was then receiving and completing her high school education.

18. Plaintiff's placement at FFS was procured through the referral pipeline on which FFS depended. While Plaintiff remained an inpatient, on information and belief Four Winds recommended FFS to her family, or, in the alternative, Stony Lodge did; a letter addressed to Plaintiff at Stony Lodge Hospital places her there at the time, and the hospital records that would identify the referring facility are in the possession of Four Winds and the New York State Department of Health. On information and belief, both Four Winds and Stony Lodge regularly

referred adolescent patients to FFS, and a substantial number of the students enrolled at FFS during Plaintiff's enrollment had been referred by them. FFS represented to Plaintiff's mother and stepfather, the latter a physician, that psychiatrists were on its staff and that Plaintiff would receive psychiatric care at FFS. Plaintiff's mother and stepfather paid FFS's tuition and charges throughout Plaintiff's enrollment, on information and belief approximately one hundred thousand dollars over the course of her enrollment inclusive of the charges described herein, by checks transmitted from Staten Island, New York City, through the United States mail. Plaintiff's mother, a nurse who understood the significance of state licensing and enforcement action against a treatment provider, was never told of the 1990 cease and desist order or of the investigations of the institution that preceded Plaintiff's enrollment, and would not have placed Plaintiff at FFS had she known of them. FFS thereby obtained payment for a placement solicited through a hospital's referral, on the representation that it was a qualified therapeutic institution staffed with psychiatrists to treat a child who had just been stabilized in a psychiatric hospital, which it was not.

19. In June 1996, Plaintiff's mother drove Plaintiff directly from the hospital to the FFS campus in Hancock, New York. Immediately upon her arrival, Plaintiff, then sixteen years old, was strip searched pursuant to FFS's intake policy in a classroom adjoining the institution's office, in the layout of the institution's original building, by female students acting at staff direction while a staff member, Audra Runge, came in and out of the room, required to remove all of her clothing and to squat and cough, and, before she had been permitted to dress, photographed.

**Defendants**

20. Defendant Education Plus Corporation, doing business as Family Foundation School (hereinafter "FFS"), is a New York corporation with its principal place of business at 431 Chapel

Hill Road, Hancock, New York 13783. FFS was the primary vehicle through which the racketeering enterprise described herein operated, providing the institutional facade, physical campus, staff hierarchy, marketing apparatus, and referral network through which children, including Plaintiff, were recruited and confined. FFS misrepresented to parents and to the hospitals and clinicians who referred children to it that it provided qualified therapeutic, psychiatric, and psychological treatment services to enrolled students while it employed no qualified professionals with which to provide such services. Of the teaching staff during Plaintiff's enrollment, on information and belief only the Spanish teacher held a degree; biology was taught by Mary Musgrove, a family head, and government by Defendant Cindy Argiros. In its final years of operation, FFS operated under the name Allynwood Academy.

21. Defendant Betty Argiros co-founded FFS together with her husband, Tony Argiros, and served as a founder, administrator, and Program Director of FFS throughout the period of Plaintiff's enrollment, during which both Tony and Betty Argiros were personally present at and involved in the institution's daily operation. Defendant Betty Argiros was the architect of the enterprise's operational policies, including the family-unit structure, the sanction and work-labor system, the restraint and isolation regime, the intake strip search and photography practice, the blackout and dress-down practices described herein, and the culture of institutional secrecy within which the conduct described herein was able to occur. FFS's own published Handbook stated that Tony and Betty Argiros were the heads of the household, that they represented the parents of the house, and that they had the final say on all matters and did not have to explain themselves to students.

22. Defendant Emmanuel Argiros a/k/a Michael Argiros is an individual who succeeded Tony and Betty Argiros as president of the FFS board beginning in 1993 and who owned, operated, and directed FFS and Education Plus Corporation in that capacity throughout Plaintiff's enrollment and

through the school's closure in 2014. Defendant Argiros personally destroyed evidentiary records by shredding, as described herein. Defendant Argiros currently owns and personally operates Kasos Enterprises LLC d/b/a Smith's Colonial Motel and Upper Delaware Inn in Hancock, New York, owns Kasos Co Family LP, which was an owner of the FFS real property, and owns K9-5 Inc.

23. Defendant Cindy Argiros, who publishes and is publicly known under the name "Cindy Ray" and as "Cindy Ray Argiros," is an individual who, on information and belief, is married to Defendant Emmanuel Argiros, and who, during Plaintiff's enrollment, taught the government class in which Plaintiff was enrolled. Defendant Cindy Argiros is the owner, editor, and publisher of Defendant The Hancock Herald, and is named in this action with respect to the fraudulent concealment alleged in Count XIII and the fraudulent conveyance described herein, as a beneficial owner and controller, together with Defendant Emmanuel Argiros, of the Kasos entities and K9-5 Inc. described herein.

24. Defendant Jeffrey Brain a/k/a Jeff Brain is an individual who served in the senior leadership of FFS, including as Vice President for External Relations and Director of Admissions, and, on information and belief, thereafter in the leadership of the school through its final years of operation as Allynwood Academy and its 2014 closure. Defendant Brain joined FFS after Plaintiff's enrollment; during her enrollment, the admissions and administrative functions he later held were performed by Bob Runge, an FFS staff member who also participated in the physical restraint of students. Defendant Brain is named because he continued the enterprise's fraud and concealment after Plaintiff's departure and through the 2014 closure, as alleged herein, and with respect to the fraudulent concealment alleged in Count XIII, the enterprise concealment conduct alleged in Counts I and II, the knowing profit and advancement alleged in Counts V and XXI, and the

obstruction of enforcement alleged in Counts XIX and XX. In his external relations capacity, Defendant Brain was the named contact for and, on information and belief, an author or approving officer of the institution's May 2008 public response to oversight hearings of the United States House of Representatives Committee on Education and Labor, in which the institution, answering the congressional testimony of a former student enrolled from 1995 through 1997, publicly characterized its 1990s practice of restraining students in blankets as a benign safety measure and marketed itself as a reformed and rigorous program, minimizing and mischaracterizing the institutional practices alleged in this Complaint, including the restraint practice to which Plaintiff herself was subjected, and continuing and maintaining the enterprise's concealment of that conduct.

25. Defendant Kasos Co Family LP is a New York limited partnership owned and controlled by the Argiros Defendants, which held title to the FFS real property and transferred it to Defendant Chapel Hill Land Holdings LLC in November 2014 at below-market value. Defendant Kasos Enterprises LLC is a New York limited liability company likewise owned and controlled by the Argiros Defendants.

26. Defendant Chapel Hill Land Holdings LLC is a New York limited liability company that acquired the FFS real property from Kasos Co Family LP in November 2014 and an additional parcel from Defendant Emmanuel Argiros in June 2016, in each case with actual or constructive notice of the claims against the transferors. On information and belief, Chapel Hill Land Holdings LLC is the acquisition entity of, or is affiliated with, the French Woods performing arts camp, the purchaser identified in the school's own closing announcement, which described the purchaser as "a neighbor and friend of the school and the Argiros family for many years." On information and belief, institutional records of FFS that survived the destruction described herein remained on the

former campus property after the 2014 closure, stored in an outbuilding on that property, within the possession and control of Chapel Hill Land Holdings LLC as its owner, for approximately a decade, and were never voluntarily disclosed or produced to law enforcement, being recovered only upon the execution of a federal search warrant, as confirmed by law enforcement testimony at Paul Geer's 2025 federal criminal trial. On information and belief, the November 2014 conveyance of the FFS campus was made for consideration of approximately two million dollars, a price materially below the value of the property conveyed, which comprised a multi-structure campus improved and maintained over decades by the uncompensated labor of FFS students, including the trailers in which students were housed and the deck that Plaintiff and other children built, the students having maintained the entire property. Institutional records of FFS remain on that property, within the possession and control of Chapel Hill Land Holdings LLC, to this day, as described herein.

27. Defendant K9-5 Inc. is a New York corporation, formally incorporated in 2014 immediately after FFS ceased operations, to which the Argiros Defendants transferred the enterprise's canine operation and related assets.

28. Defendant NBT Bank, N.A. is a federally chartered national bank that has maintained a continuous banking presence in the Village of Hancock, New York since 1907, a period encompassing the entirety of Plaintiff's 1996-1997 enrollment and FFS's operational life from its founding through its 2014 closure. At all relevant times, NBT Bank, N.A. held one or more accounts in the name of Education Plus Corporation d/b/a Family Foundation School and, on information and belief, in the names of its principals, through which the tuition payments, including the tuition and charges paid on Plaintiff's behalf by her family, and other financial proceeds of the racketeering enterprise described herein were deposited, processed, and disbursed.

As the bank serving the Village of Hancock throughout the relevant period, NBT Bank received substantial financial benefit from that account relationship, and knew or should have known from the scale of that revenue and the publicly available record of FFS's unlicensed and abusive operation, including the August 1990 cease and desist order, that the institution from which it was receiving that benefit was operating unlawfully. The public record shows blanket security interests in Education Plus Corporation's operating assets filed in 2002, and again in 2004 and 2006, covering the operation's equipment, inventory, accounts, general intangibles, and contract rights together with their proceeds, so that the bank's collateral included the operation's tuition receivables and enrollment contracts themselves; new security interests taken from both Education Plus Corporation and Kasos Co Family LP on November 19, 2008, months after the congressional hearings described herein; a recorded loan of six hundred eighty thousand dollars to Kasos Co Family LP, the family entity then holding title to the FFS campus, on March 24, 2010, secured by the campus that the children's labor, including Plaintiff's, had improved; continuations of its filings in 2010, 2011, and 2013; Uniform Commercial Code termination statements filed on December 12, 2014, in the course of the wind-down; and, on February 27, 2015, a new blanket security interest against Chapel Hill Land Holdings LLC. The bank did not need to ask anyone for the operation's financial records: it already held them, because the operation's accounts were the bank's own accounts, and every tuition deposit, every disbursement, and every payroll check passed through the bank's own ledgers. Neither the 2008 congressional testimony nor the 2014 closure and sale, nor the 2024 indictment, nor the 2025 conviction of Paul Geer, prompted the bank to file a Suspicious Activity Report, to make any report to any regulator or law enforcement agency, to freeze or hold any account, funds, or transaction pending inquiry, or to decline the transactions before it; instead, on information and belief, the bank financed the conveyance of the

campus, collected satisfaction of its own credit from it, and took the transferee as a new lending customer. NBT Bank's repayment under those instruments depended on the School's continued enrollment of children and continued receipt of tuition. Its return was not a fee on a customer's ordinary accounts but a stake in the operation itself, and its interest, like that of every Hancock business the School's revenue supported, was in that operation continuing. As the only commercial bank in the Village of Hancock, NBT Bank held the village's deposits, extended its credit, and financially sponsors the corporation whose stated purpose is to "combat community deterioration"; on information and belief, a substantial share of the Hancock branch's deposits and lending derived from the School's revenue and the families and businesses that revenue sustained, so that the bank's position in the village, like the village's, was bound to the School's survival. NBT Bank's relationship with the School's president was institutional, not personal. NBT Bank is a member, in its own name, of the Hancock Area Chamber of Commerce, is listed in the Chamber's directory as its banking member on a website published by the Town of Hancock, and pays its dues into a treasury Defendant Emmanuel Argiros keeps as the Chamber's treasurer. NBT Bank financially sponsors Hancock Partners, Inc., the economic-development corporation Defendant Emmanuel Argiros presides over, and Dawn Joyce, the manager of NBT Bank's Hancock branch for approximately eighteen years, whose duties included the School's accounts and credit, serves under Defendant Emmanuel Argiros as a director of that corporation. Her knowledge of the School, its finances, and its president, acquired in managing the branch that held the School's accounts and administered its credit, was material to her duties and is the knowledge of NBT Bank.

29. Defendant NBT Bancorp Inc. is the controlling parent of NBT Bank, N.A. and is named in that capacity.

30. From December 2, 2002 through December 18, 2021, without interruption, NBT Bank, N.A., directly and through Pennstar Bank, a division of NBT Bank, N.A., held one or more perfected security interests in the collateral of Education Plus Corporation. The public record shows blanket security interests filed against Education Plus Corporation in New York on December 2, 2002, January 30, 2004, May 30, 2006, and November 19, 2008, and in Pennsylvania on December 18, 2006; a security interest filed against Kasos Co Family LP on November 19, 2008; continuations filed on December 13, 2010, June 21, 2011, and October 31, 2013; the mortgage loan of March 24, 2010 to Kasos Co Family LP against the campus; the New York releases of December 12, 2014; and a Pennsylvania continuation filed on September 15, 2016. That secured position began five years after Plaintiff's departure, on collateral her labor and the labor of the children after her had built and maintained, and outlasted the school's closure by seven years.

31. On December 12, 2014, one month after Kasos Co Family LP conveyed the campus to Chapel Hill Land Holdings LLC, NBT Bank released its New York liens on the school's collateral. On February 27, 2015, NBT Bank filed a new blanket security interest against Chapel Hill Land Holdings LLC covering its equipment, fixtures, inventory, accounts, contract rights, general intangibles, timber, and oil, gas, and minerals, a lien that remained in force through February 27, 2020. On information and belief, NBT Bank's loan to Chapel Hill Land Holdings LLC funded the conveyance of the campus, and NBT Bank was repaid its own credit to the school from the proceeds of that conveyance.

32. On September 15, 2016, nearly two years after the school closed, NBT Bank renewed its blanket security interest in the collateral of Education Plus Corporation by continuation, so that NBT Bank held that lien every day through December 18, 2021. Under the Uniform Commercial Code a perfected security interest lapses five years after filing; it can be continued only by a

continuation statement filed within the six months before lapse and only with the secured party's authorization; and absent that filing NBT Bank's lien would have ended on December 18, 2016. NBT Bank chose to continue it. On information and belief, NBT Bank collected interest, fees, and other charges on its secured credit throughout that period.

33. On information and belief, as of the filing of this action NBT Bank still holds the accounts of the Argiros family, of Kasos Co Family LP and Kasos Enterprises LLC, of K9-5 Inc., and of Chapel Hill Land Holdings LLC, and holds the proceeds of the enterprise's assets, and it has never terminated its relationship with the enterprise or its principals. On information and belief, NBT Bank placed no hold on any of those accounts and made no disclosure to any authority at the April 2024 indictment of Paul Geer, at the execution of the federal search warrant on the former campus, during the February 2025 trial, or upon the March 3, 2025 conviction, and has not provided its records of the enterprise to the federal authorities handling the Family Foundation School matter.

34. Defendant Sysco Syracuse, LLC is a Delaware limited liability company with its principal place of business in Warners, New York, and is the Sysco Corporation operating subsidiary whose central New York distribution territory includes Delaware County, New York. On information and belief, Sysco Syracuse, LLC, or its predecessor in that territory, distributed food and institutional supplies to FFS on a recurring, scheduled basis throughout the relevant period, including during Plaintiff's enrollment and through the school's 2014 closure, delivering by truck to the FFS campus, and was paid for those goods and deliveries from the tuition-funded accounts described herein, while the children confined at the institution, including Plaintiff, unloaded its deliveries and prepared and served the food it supplied as part of the uncompensated labor described herein. Defendant Sysco Corporation is a Delaware corporation with its principal place of business in

Houston, Texas, and is the controlling parent of Sysco Syracuse, LLC, named in that capacity (together with Sysco Syracuse, LLC, "Sysco").

35. Defendant Greyhound Lines, Inc. ("Greyhound") is a Delaware corporation with its principal place of business in Dallas, Texas, and an interstate passenger motor carrier that, at all relevant times, operated scheduled intercity bus service between Ithaca, New York and the Port Authority Bus Terminal in New York City, on which Plaintiff traveled when she fled FFS as described herein. Greyhound has operated continuously since Plaintiff's enrollment under successive owners and is presently owned, on information and belief, by Flix North America Inc., a subsidiary of Flix SE. On information and belief, Greyhound's personnel, upon inquiry from Hancock PD or FFS or on their own report, identified Plaintiff, a sixteen-year-old girl traveling alone, as a passenger who had boarded its service at Ithaca and communicated her presence on that service and its scheduled arrival to law enforcement in New York City, so that a transit officer was waiting for her with the institution's photograph when the bus arrived; and Greyhound collected the fare for that transport. Greyhound thereby participated in the runaway-recovery arrangement described herein by which children who fled the institution were located and returned to it, and is named in this action with respect to the enterprise conduct alleged in Counts I and II, the knowing advancement and profit alleged in Count V, and the knowing benefit alleged in Count XXI.

36. Defendant Four Winds, Inc., doing business as Four Winds Hospital and Four Winds Westchester, is, on information and belief, a New York business corporation that owns and operates a proprietary psychiatric hospital at 800 Cross River Road, Katonah, Westchester County, New York, licensed by the State of New York to provide inpatient psychiatric treatment to children and adolescents, and that operated that hospital throughout the relevant period, including in 1996. Plaintiff was an inpatient at Four Winds in 1996, where she was stabilized on lithium under the care

of its psychiatrists. On information and belief, while Plaintiff remained in its care, Four Winds recommended FFS to her family as the placement to which she should be discharged, and she was transported into FFS's custody directly from the hospital at which she was then an inpatient; in the alternative, that recommendation was made by Stony Lodge Hospital, the other Westchester psychiatric hospital at which Plaintiff was an inpatient that year, which has since closed and is not named as a defendant. On information and belief, Four Winds regularly referred adolescent inpatients to FFS throughout the relevant period, and a substantial number of the children enrolled at FFS during Plaintiff's enrollment had been discharged to it from Four Winds. A licensed psychiatric hospital discharging a psychiatric inpatient it had just stabilized on medication to a residential facility is bound to know what that facility is: on information and belief, Four Winds knew, or in the exercise of the care its license required should have known, that FFS operated under a public cease and desist order for operating without a license, employed no psychiatrist and no licensed clinician, and did not continue the psychiatric medication of the children it received, and it referred Plaintiff and other children there regardless. On information and belief, Four Winds received, in return for its referrals, consideration from the enterprise, reciprocal referrals and admissions, or the discharge-placement capacity on which its own inpatient census and revenue depended. Four Winds is named in this action with respect to the knowing advancement of and profit from child labor trafficking alleged in Count V and the knowing-beneficiary liability alleged in Count XXI, and is not named in Counts I and II.

37. Defendant The Hancock Herald is the local newspaper serving the Village of Hancock, owned and controlled at all relevant times by Defendant Cindy Argiros, a principal of the enterprise, which published promotional content concerning FFS furthering the enterprise's fraudulent marketing of the school while not reporting the 1990 cease and desist order or other matters of

public concern regarding FFS's operation, and, until very recently, declining to publish any story concerning matters in which FFS students were involved.

38. Defendant Village of Hancock, New York is a municipal corporation organized under the laws of the State of New York, adjoining the territory on which the FFS campus operated, sued individually and through the Village of Hancock Police Department ("Hancock PD"), the municipal police department owned, operated, funded, and controlled by the Village, whose officials possessed the official notice of FFS's unlicensed operation described herein, including, from December 2010, the joint findings of four New York State agencies that former students' accounts of abusive practices were credible, yet permitted FFS to continue operating, and whose police, on information and belief, located and returned to the institution students who fled it, using the intake photographs the institution supplied to them, including, as described herein, Plaintiff herself.

39. Defendant Town of Hancock, New York is a municipal corporation organized under the laws of the State of New York, separate and distinct from the Village of Hancock, within whose borders the FFS campus at 431 Chapel Hill Road is located. At all relevant times, including during Plaintiff's enrollment, the Town exercised governmental authority over the territory on which FFS operated and possessed the official notice of FFS's unlicensed operation described herein, including, from December 2010, the joint findings of four New York State agencies that former students' accounts of abusive practices were credible, yet permitted FFS to continue operating.

40. Defendant Delaware County Sheriff's Office is the law enforcement agency for Delaware County, New York, in which FFS is located, and Defendant Delaware County Board of Supervisors is the governing legislative body of Delaware County. Defendant County of Delaware,

New York ("the County") is a municipal corporation organized under the laws of the State of New York, within whose borders the FFS campus operated throughout the relevant period and which is the entity liable for the customs, policies, and practices of the Sheriff's Office and Board of Supervisors alleged herein.

41. Defendant National Association of Therapeutic Schools and Programs ("NATSAP") is a national membership and accreditation organization for therapeutic boarding schools and residential treatment programs, founded in 1999, after Plaintiff's enrollment, of which FFS was a founding member. NATSAP accepted FFS as a founding member, lent FFS the institutional legitimacy of its membership designation, and published and promoted FFS's membership in its directories and marketing materials, which were used by parents and by placing school districts and referring clinicians as evidence that FFS met recognized standards for therapeutic residential programs. NATSAP received membership dues from FFS throughout the period of FFS's membership and knew or should have known that FFS operated without the licenses, credentials, and professional staff its membership status implied it possessed.

42. Rita Argiros, who died in 2015 and is not named as a defendant in this action, was the daughter of FFS's founders, the sister of Defendant Emmanuel Argiros, and the daughter of Defendant Betty Argiros. In 2000, after Plaintiff's enrollment, Rita Argiros became the Executive Program Director of FFS, a role in which, by her own published account, she reshaped the practices and procedures of the school, and she founded the school's canine program, known as the Dog Corps, which, on information and belief, was staffed by the unpaid labor of FFS students from its founding through the school's 2014 closure. Rita Argiros was simultaneously the founder and president of the search dog organization named in the following paragraph.

43. Defendant Eagle Valley Search, Rescue and Recovery Team, Inc., doing business as Eagle Valley Search Dogs ("Eagle Valley"), is a New York not-for-profit corporation with a principal place of business in Wurtsboro, New York, founded and presided over by Rita Argiros. Upon information and belief, the enterprise's canine operation and Eagle Valley's operation were conducted in common by the same Argiros family principal; the unpaid labor of FFS students, who walked, fed, cared for, and served as training subjects for the school's dogs, supported the care, maintenance, and training of dogs from which Eagle Valley's operation benefited; Eagle Valley thereby maintained, through its own founder and president, a continuous relationship with the enterprise from 2000 through its 2014 closure and knew, through her, of its nature; and Eagle Valley benefited from the continued operation of a venture whose campus, margin, and going-concern value were the accumulated product of the labor of the children who passed through it, including Plaintiff.

44. Jan Cheripko, who died in 2024 and is not named as a defendant in this action, was at all relevant times, including, on information and belief, throughout Plaintiff's enrollment, simultaneously a staff member of FFS, an author published by Boyds Mills Press, and, upon information and belief, an editor and freelancer for the Highlights organization. Through Cheripko, the publishing organization named in the following paragraph was embedded in the purported education the enterprise sold to paying families and school districts.

45. Defendant Highlights for Children, Inc. and Defendant Boyds Mills (formerly the Highlights Foundation) (together, the "Highlights Defendants") are affiliated entities that publish the Highlights magazines and operate, among other things, a retreat property of approximately 1,300 acres in Wayne County, Pennsylvania. The January 2026 renaming of the Highlights Foundation as Boyds Mills reflects an unbroken continuity of the same entity. The Highlights Defendants'

publications and programs were integrated into the purported education for which the enterprise's families, including Plaintiff's, paid: upon information and belief, FFS purchased Highlights publications for use in the school's purported educational program with tuition-funded money, so that a portion of the tuition extracted for the enterprise's students flowed directly to the Highlights Defendants; the uncompensated forced labor of the children subsidized the operation from which those payments were made; and, on information and belief, FFS students were brought to the Highlights Defendants' Wayne County retreat, where they performed uncompensated labor from which the Highlights Defendants benefited. The Highlights Defendants thereby knowingly advanced and profited from, and knew or should have known, through Cheripko, their own author and editor embedded on the campus, of the nature of, the operation alleged herein.

## FACTUAL ALLEGATIONS

### A. The Family-Unit Structure and Institutional Control

46. When Plaintiff arrived at FFS in June 1996, the school's population was divided into several "family" units, each housed and supervised separately. Plaintiff was assigned to Family One, under family heads Paul Geer and Robin Ducey, and was later reassigned to Family Four when that unit was opened under family heads Tom and Mary Musgrove. Plaintiff was housed in a trailer on the campus which, on her observation, had no fire alarm, and in which students were locked at night, a practice known within the institution as "land locking" that was the subject of one of the multi-agency investigations of the institution described herein. FFS's institutional structure vested near-total control over students' daily lives, movement, and contact with their families in the family-unit staff, a structure that both enabled and concealed the conduct described herein.

47. Control was enforced through a system of "sanctions," punishments imposed at the discretion of staff, including, in Plaintiff's case, work sanctions, rock sanctions, dress-down sanctions, blackout from her family, confinement to a corner, and restraint and isolation, each of which stripped a student of whatever small privileges she had earned and set her back in "the program," so that each sanction extended the time the student would remain at the school and the tuition and charges the institution would collect for her. The students lived in constant fear of being singled out for sanction, a fear FFS cultivated deliberately and used as its principal instrument of control.

**B. Recruitment Through the Hospital Referral Pipeline and the Financial Arrangements**

48. Plaintiff was recruited to FFS through the referral of a psychiatric hospital at which she was then an inpatient, on information and belief Defendant Four Winds or, in the alternative, Stony Lodge Hospital, which recommended FFS to her family while Plaintiff remained in its care. On information and belief, both hospitals regularly referred adolescent patients to FFS, and FFS cultivated and depended upon referrals from hospitals and clinicians of that kind. FFS represented to Plaintiff's mother and stepfather that it was a qualified therapeutic institution, that psychiatrists were on its staff, and that Plaintiff would receive psychiatric care there and complete her high school education. FFS marketed itself to placing families and referring institutions, including Plaintiff's, through its promotional materials and representations that it was a qualified therapeutic institution staffed to provide psychiatric and psychological treatment. Plaintiff's mother and stepfather relied on those representations in placing Plaintiff at FFS and in paying tuition and charges to Defendants, on information and belief approximately one hundred thousand dollars over the course of her enrollment, by checks transmitted from Staten Island, New York City, through the United States mail, over the sixteen months of Plaintiff's enrollment.

49. In addition to tuition, FFS billed Plaintiff's family separately for incidentals, laundry, and trips; billed approximately two hundred dollars per month for shampoo, conditioner, and other toiletries; and billed one hundred fifty dollars for each restraint and isolation of Plaintiff described herein, the latter charge entered on the institution's billing under a description that did not disclose what it was for. On information and belief, and consistent with the institution's billing practices as established by evidence at the 2025 federal criminal trial described herein, those separately billed charges were a systematic feature of the institution's extraction of money from the families of the children in its custody.

50. Plaintiff went to FFS willingly. She was driven to the campus in June 1996 directly from the hospital by her mother, on the understanding, which FFS's representations had created, that FFS was a boarding school at which she would receive treatment and finish high school. FFS had arranged her enrollment and its financial terms with her mother and stepfather in advance.

**C. Compelled Strip Search and Photography**

51. Immediately upon her arrival at FFS in June 1996, Plaintiff, then sixteen years old, was strip searched pursuant to FFS's intake policy, without medical screening, parental consent, or lawful authority: in a classroom adjoining the institution's office, in the layout of the institution's original building, she was required by female students acting at staff direction, while a staff member, Audra Runge, came in and out of the room, to remove all of her clothing and, while naked, to squat and cough in the manner of a custodial cavity inspection. Immediately after the search, and before Plaintiff had been permitted to dress, FFS staff photographed her. On information and belief, the photograph depicted Plaintiff unclothed, was taken on self-developing instant film, and was placed directly into a book maintained by the institution. On information and belief, the strip search and

photographing of Plaintiff were an instance of a uniform institutional practice applied to every child admitted to FFS.

52. On information and belief, FFS photographed every student at or shortly after intake, photographing students from the chest up as a baseline and photographing the entire body of any student who bore a tattoo, scar, or other distinctive mark, including students who were photographed naked. The images were captured on self-developing instant film and placed directly into books that the institution maintained and retained, and that remained in its possession and control through at least FFS's 2014 closure. FFS sent its ordinary student photography, including student journalism and activity photographs, to commercial photographic developers in the Village of Hancock for processing, but never sent the images of unclothed students to any outside developer, confining those images to a self-developing format and to the institution's own books so that no person outside the institution would see them.

53. On information and belief, FFS supplied copies of students' intake photographs to local law enforcement, including Hancock PD and the Delaware County Sheriff's Office, as part of a standing arrangement under which officers used the institution's photographs to locate students who fled the campus and to return them to the institution's custody, and officers did use the institution's photographs for that purpose during the period of its operation, including, as described in Section H below, to locate and return Plaintiff herself.

**D. The Discontinuation of Plaintiff's Psychiatric Care and the Denial of Medical Care**

54. FFS accepted Plaintiff with full knowledge of her psychiatric history, having solicited her placement through the psychiatric hospital in which she was then an inpatient and having represented to her parents that psychiatrists were on its staff. FFS employed no psychologist or

licensed therapist on its staff, and the psychiatrist to whom it had access saw Plaintiff, on information and belief, at most once during her sixteen-month enrollment. Medications, including over-the-counter medications, were dispensed to students by a staff member, Christine Speicher, who is not a licensed medical doctor, from a closet-like room off the Family One dining room. Plaintiff arrived at FFS on the lithium on which she had been stabilized in the hospital. FFS discontinued that medication. No psychiatrist meaningfully evaluated, treated, or monitored Plaintiff at FFS during her sixteen-month enrollment, no licensed medical professional evaluated the discontinuation of her medication or its effects, and when Plaintiff cut her wrists during her enrollment, staff told her that she was an attention seeker and made her stand in the corner rather than provide any treatment.

55. During her enrollment, Plaintiff ran a fever of approximately one hundred four degrees for a period of days before FFS took her to an outside physician in Hancock. She suffered repeated bouts of tonsillitis during and after her enrollment.

**E. Forced Labor**

56. Throughout her enrollment, Plaintiff performed uncompensated institutional labor that was neither incidental to nor part of any genuine therapeutic or educational program. The students maintained the entire property: landscaping, painting, staining, and any other work that needed to be done on the campus was drawn from students on work sanction. Plaintiff was assigned to dish crew and to waitstaff duty, serving the meals eaten by the student body and staff; to cleaning crews; to stripping and waxing the institution’s floors, which she did repeatedly; to cleaning the institution’s office; to shoveling snow; to cleaning out the institution’s dumpster and garbage area; to refilling the gravel on the road to the institution’s chapel as it wore down; and to “rock

sanctions," in which she was made to move one pile of rocks to another and back. Plaintiff and other students constructed the trailers in which students were housed and a deck outside the trailer in which Plaintiff was housed, permanent improvements to the real property, at a time when the institution's school building was being erected by a paid construction crew. Students, including Plaintiff, were also sent to perform labor at the private housing of staff members and at the wedding of family head Paul Geer. Plaintiff was placed on work sanction for such infractions as declining to "take her inventory" while being degraded at the table. This labor, imposed on a minor in Defendants' custody and substituted for the treatment and education for which her family was paying, was uncompensated labor extracted from a child under the threat of sanction, restraint, and continued confinement.

57. FFS also assigned Plaintiff and other students to clean and prepare the campus before parents were scheduled to visit, so that the institution presented to visiting families an appearance that its ordinary condition did not warrant, the institution staffing its own custodial and maintenance functions, and the staging of its premises for the parents who paid for it, with the unpaid labor of the minors in its charge. FFS also used its students to conduct tours of the campus for prospective families, as part of the marketing described herein; Plaintiff declined to conduct them because she would have told the visiting families not to send their children.

58. Among the forced labor described herein, FFS assigned student crews to receive and unload the institution's commercial food deliveries, including the recurring truck deliveries made by Sysco, whose deliveries to the campus Plaintiff recalls from her enrollment. Plaintiff was among those children assigned to that labor: Plaintiff personally received the distributor's goods as they were unloaded from its trucks and carried them into the institution's freezer and storage areas, working directly alongside and in the immediate presence of Sysco's drivers and delivery personnel, who

returned to the campus on a regular delivery schedule and repeatedly observed Plaintiff and other minor children performing that labor. On information and belief, the volume and composition of the food FFS ordered from Sysco was materially inconsistent with the adequate feeding of the resident child population its personnel observed, a fact reflected in Sysco's own order, invoice, and delivery records. Sysco thereby received throughout the relevant period both recurring tuition-funded payment for its goods and the direct benefit of unpaid child labor in the performance and completion of its own deliveries, which spared Sysco the driver and delivery labor that completing its deliveries otherwise required.

**F. Blackout, Dress-Down Sanctions, Sexualized Conversation, and Food**

59. Throughout her enrollment, FFS placed Plaintiff on "blackout," a prohibition on all contact and communication, with respect to male students, imposed by family head Paul Geer within three days of her arrival and maintained for the entirety of her stay, and imposed blackout from contact with her family as a sanction. The prohibition on any ordinary communication with male students during her adolescence impaired Plaintiff's ability to form relationships with men for decades afterward. Plaintiff was not permitted a single home visit during her sixteen months at FFS.

60. FFS imposed on Plaintiff "dress-down" sanctions and prohibited her from wearing makeup or jewelry, sanctions directed at her appearance and presentation as a teenage girl. As a sanction, Plaintiff was made to cut her hair to her chin because staff regarded her hair as vanity. Adult staff subjected Plaintiff, then sixteen and seventeen years old, to sexually explicit and inappropriate conversation, and at the staff-run "table topics" sessions at which students were required to speak, staff raised and used against Plaintiff the sexual assault she had suffered before her enrollment, compounding rather than treating that trauma. Together with the strip searches and photographing

described herein and the food practices described below, these practices formed a regime of institutional control directed at Plaintiff's body, appearance, and sexuality as a female adolescent.

61. FFS used food as an instrument of control. Plaintiff was forced to eat fish, to which she was allergic, and FFS first placed her on double portions and then, when she gained weight as a result, on half portions. This use of food as control was of a piece with the food-related sanctions practices alleged in the related actions described herein.

62. FFS staff limited, monitored, and censored students' contact with their families, including, in Plaintiff's case, through the blackout sanctions described herein, the denial of any home visit for the entirety of her enrollment, and the monitoring of every telephone call by a staff member or a senior student assigned to listen, who disconnected the call at a single word the monitor deemed wrong and placed the student on blackout, so that her family never observed the ordinary conditions of her confinement and saw only a campus the children had been made to stage for them.

**G. Physical Restraint, Duct-Tape Binding, Isolation, and Videotaping**

63. On multiple occasions during her enrollment, Plaintiff was physically restrained by FFS staff and by senior students acting at staff direction, wrapped in blankets, and bound with duct tape, and was then left so bound in the room off the boot closet, for days at a time, without access to a toilet. The first such isolation lasted five consecutive days. The restraint practice described herein is the practice that the institution, in its May 2008 public response to congressional oversight, characterized as a benign safety measure modeled on first aid for seizures.

64. On information and belief, and consistent with the institution's billing practices as established by evidence at the 2025 federal criminal trial described herein, FFS billed Plaintiff's parents a charge of one hundred fifty dollars for each such restraint and isolation of Plaintiff, entered on the

institution's billing under another description that did not disclose what the charge was for, so that the institution charged families for the binding and isolation of their children while concealing from them what they were paying for. Plaintiff's mother did not know that her daughter was being bound in blankets with duct tape; she learned of it only years later.

65. FFS videotaped each restraint of Plaintiff, telling her that the recording was made for staff safety. On information and belief, those recordings were retained by the institution and have never been disclosed or produced to any authority.

66. Plaintiff was also made, as a sanction, to spend extended periods standing or sitting in a corner. While Plaintiff was in isolation, in the corner, or on work sanctions, she received no schooling; the sanctions regime displaced her education for substantial portions of her enrollment.

**H. Plaintiff's Flight to New York City, Her Seizure at the Port Authority Bus Terminal, and Her Return**

67. During her enrollment, Plaintiff fled the FFS campus. She left the trailer in which she was housed at night, without any alarm sounding, and walked to the bus stop at the McDonald's restaurant in Hancock, the stop for the commercial bus service to New York City, to wait for the bus. While she waited there, she saw police officers searching for her. On information and belief, FFS had by then reported her flight to Hancock PD and supplied it with the photograph the institution had taken of her at her intake, and the officers she saw were searching for her pursuant to the runaway-recovery arrangement described herein. Plaintiff left the stop before the officers reached her, ran to the main road, and hitchhiked; the driver who picked her up drove her to Ithaca, New York, and paid for her bus ticket, and there she boarded a Greyhound bus to New York City.

The bus passed back through Hancock on its route, where FFS staff and students were at the stop looking for her, and Plaintiff hid on the bus as it passed.

68. By the time Plaintiff's bus arrived that night at the Port Authority Bus Terminal in Manhattan, a New York City Police Department transit officer was waiting for her, holding a photograph of Plaintiff. When she stepped off the bus, the officer handcuffed her, took her into a room at the terminal, and held her there. On information and belief, Hancock PD, having failed to find Plaintiff in Hancock and knowing that she was from New York City, transmitted the institution's photograph of her and an alert to police in New York City, including transit police, so that Plaintiff would be intercepted on her arrival and returned to the institution. Plaintiff was held until her mother collected her from the terminal. She slept in her own home that night, the first night she had spent there in a year, and that night told her mother for the first time what was being done to her at FFS. Her mother, who was under the institution's influence and had been told by FFS that its students would lie and say anything to be taken out, believed the institution, and drove Plaintiff back to FFS the following day.

69. The bus on which Plaintiff traveled from Ithaca to New York City was operated by Defendant Greyhound. On information and belief, the officer who met that bus knew which bus Plaintiff was on and when it would arrive because Greyhound's personnel, upon inquiry from Hancock PD or FFS or on their own report, identified a girl matching the institution's photograph as a passenger who had boarded at Ithaca and communicated her presence and the bus's scheduled arrival to police in New York City. Greyhound was paid the fare for that transport.

70. Upon her return to FFS, Plaintiff, still a minor, was strip searched a second time, made again to remove all of her clothing in the manner described above. No photograph was taken on that occasion.

71. Plaintiff's seizure in New York City and her return to the institution were an instance of the standing runaway-recovery practice described in Section C above, by which the institution used its intake photographs and the assistance of law enforcement to locate students who fled and to return them to its custody and to the conditions described herein. The girl obtained from Staten Island was re-obtained from the City of New York, through her mother, whom the institution had prepared to disbelieve her, and stripped and searched again upon her return.

**I. Transport Across State Lines**

72. During her enrollment, FFS transported Plaintiff out of the State of New York on a chorus trip to Virginia Beach, Virginia, organized and supervised by FFS staff, in whose custody Plaintiff traveled, and returned her from that trip to the campus and to the regime described herein. On information and belief, that trip was conducted under the direction and supervision of Paul Geer, the chorus director, and was one of the recurring out-of-state and international chorus trips on one of which, in 2001, Geer transported an FFS student to Toronto, Ontario, Canada for the purpose of criminal sexual activity, the offense of which he was convicted on March 3, 2025. Plaintiff, a minor in the institution's custody, had no ability to refuse the trip or the transport.

**J. Plaintiff's Departure and the Withholding of Her Transcripts**

73. Plaintiff turned eighteen in October 1997 and left FFS the following day, without graduating. When Plaintiff thereafter sought to return to high school, FFS refused to release her transcripts, citing a balance of approximately three hundred dollars on her mother's account, and Plaintiff was

unable to re-enroll. She did not obtain a high school equivalency diploma until approximately three years later, and she did not begin college until 2007. FFS's withholding of Plaintiff's transcripts was an instance of its practice of using the children in its custody, and the records it held concerning them, as leverage for the collection of its charges.

**K. FFS's Documented Unlicensed Operation and Pattern of Concealment**

74. FFS's unlicensed and abusive operation was a matter of public record throughout Plaintiff's enrollment: in August 1990, the New York State Division of Alcoholism and Alcohol Abuse issued FFS a formal, public cease and desist order for operating without the license required by New York law. Defendants continued to operate, enroll, and confine children, including Plaintiff beginning in June 1996, notwithstanding that order, without disclosing it to Plaintiff's family. In 2008, the practices of FFS were the subject of oversight hearings before the United States House of Representatives Committee on Education and Labor, to which the institution publicly responded, through Defendant Brain, by characterizing its restraint and sanction practices as benign and marketing itself as a reformed and rigorous program. In 2010, following complaints by former students, the New York State Commission on Quality of Care and Advocacy for Persons with Disabilities, the Office of Mental Health, the Office of Alcoholism and Substance Abuse Services, and the State Education Department jointly investigated FFS, including a site visit in June 2010 and written correspondence with FFS in September and October 2010, and on December 29, 2010 the four agencies wrote jointly to Defendant Emmanuel Argiros, as President of FFS, stating their finding that the accounts of former students spanning approximately 2000 through 2010 concerning abusive practices at the institution were credible and strikingly similar to one another, and noting a 2008 visit by an accrediting body after which practices the agencies described as formerly punitive had rapidly changed. Defendants continued to operate, enroll, and confine

children for four more years. Those findings concerned the treatment of children; they did not disclose, and no state agency has ever disclosed, the financial structure of the enterprise, who profited from it, or the participation of the institutional Defendants named herein.

75. Throughout and after Plaintiff's enrollment, FFS staff limited, monitored, and censored students' contact with their families, preventing full disclosure of the true conditions of confinement, as Plaintiff's blackout sanctions, the denial of any home visit, and the staging of the campus before her parents' visits illustrate. On information and belief, and as later confirmed by testimony in the 2025 federal criminal trial of Paul Geer, the Argiros family deliberately destroyed student records, abuse complaints, and other institutional documentation, directly depriving Plaintiff and other former students of the evidentiary record necessary to discover and assert their claims. FFS's Handbook required that all outgoing student mail be read and initialed by a staff mentor and all incoming mail be read by staff, barred any telephone contact for the first month of enrollment and thereafter limited students to two staff-dialed calls per week of five minutes each, and authorized mail and phone blackouts as sanctions.

76. Education Plus Corporation's publicly filed tax returns reported that the institution made no money and listed members of the Argiros family and other staff as receiving no compensation from it. On information and belief, the compensation and benefits the Argiros family drew from the enterprise were taken through the affiliated entities and accounts described herein rather than reported as compensation, and those filings concealed from regulators, from the public, and from the families who paid the institution's charges the disposition of the revenue the enterprise collected.

**L. Discovery of the Enterprise**

77. Plaintiff did not discover the true, coordinated, institutional character of the enterprise responsible for her injuries until the disclosures made in and around Paul Geer's 2025 federal criminal prosecution and trial, which Plaintiff attended in person. It was the evidence and testimony adduced at that public trial that first revealed the enterprise's decades-long pattern of institutional concealment, the destruction of records, the institution's practice of billing families for the isolation confinement of their children, and the coordinated participation of the individual and institutional Defendants named herein, and that gave rise to the filing of this action.

**M. Injuries and Damages**

78. As a direct and proximate result of Defendants' conduct described herein, Plaintiff has suffered severe and lasting injury, including but not limited to: the loss of her high school education, including her inability to complete high school, the withholding of her transcripts, her inability to obtain a high school equivalency diploma until approximately three years after leaving FFS, and the delay of her college education until 2007; the value of sixteen months of uncompensated labor; three suicide attempts in 1999; a psychiatric hospitalization in 2005; decades of substance use disorder requiring seventeen admissions to treatment programs, and psychological injury for which she did not obtain effective treatment until she received EMDR therapy; recurrent tonsillitis; diminished earning capacity resulting from the delay and derailment of her education; and physical, emotional, and psychological injury, pain and suffering, humiliation, and loss of enjoyment of life. Plaintiff did not publicly disclose what had been done to her at FFS until approximately 2013; before then, only persons close to her knew.

## TOLLING OF STATUTES OF LIMITATIONS

79. Plaintiff's claims arising from conduct constituting abuse or degrading treatment committed against her while a minor, including the strip searches and photographing of Plaintiff described herein and her claims for battery, false imprisonment, and intentional infliction of emotional distress described herein, are timely pursuant to CPLR 208(b), which extends the infancy toll applicable to such claims until the victim's fifty-fifth birthday.[1] Plaintiff was born in October 1979, and is presently forty-six years of age; her claims are accordingly timely on this independent ground alone, without regard to any other tolling doctrine set forth below.

80. Plaintiff's RICO claims are timely. Plaintiff did not discover the true nature of the racketeering enterprise until the disclosures made in and around Paul Geer's 2025 federal criminal prosecution and trial, and the limitations period began to run, at the earliest, upon that

1 Plaintiff asserts no claim under CPLR 214-g. The revival window established by the Child Victims Act closed discovery; it was the evidence and testimony adduced at that public trial that first revealed the coordinated, institutional, and enterprise character of the conduct. Independently, all applicable limitations periods are tolled by Defendants' fraudulent concealment, the self-concealing nature of the conspiracy, and the overt acts of concealment committed in furtherance of the conspiracy within the limitations period, as set forth below.

81. Plaintiff's claims under 18 U.S.C. §§ 1589, 1590, 1591, and 1595 arising from her enrollment, which continued through October 1997, and from the continuing receipt of the benefits of that enrollment and of the venture's operation alleged herein, are timely under 18 U.S.C. § 1595(c),

---

[1] before this action was commenced. Should the Legislature reopen or extend that revival window, or enact comparable revival legislation, Plaintiff reserves the right to seek leave to amend this Complaint to assert all claims thereby revived.

together with discovery-based accrual and the fraudulent-concealment, equitable-estoppel, and self-concealing-conspiracy grounds set forth herein.

82. Plaintiff's claims under 18 U.S.C. § 1595 for the obstruction of enforcement alleged in Counts IV, VII, VIII, IX, XVII, XVIII, XIX, and XX arise from continuing violations, each of which has continued through the 2024 federal indictment and March 3, 2025 conviction of Paul Geer and through the filing of this action, and each month of which constitutes a fresh act within the limitations period, together with discovery-based accrual and the fraudulent-concealment, equitable-estoppel, and self-concealing-conspiracy grounds set forth herein. Plaintiff's claims under 18 U.S.C. § 2255 are subject to no limitations period, the Eliminating Limits to Justice for Child Sex Abuse Victims Act having eliminated the statute of limitations for § 2255 claims not already time-barred as of September 16, 2022, and Plaintiff's claims, subject to discovery-rule accrual, were not time-barred as of that date.

83. Independently and alternatively, all applicable statutes of limitations are tolled on each of the following independent grounds:

(a) Fraudulent Concealment. Defendants engaged in a coordinated scheme of affirmative concealment including: (i) FFS staff limited, monitored, and censored students' contact with their families, including through the reading and censorship of outgoing and incoming mail and the limitation of telephone contact described in FFS's own Handbook, and, in Plaintiff's case, the blackout sanctions imposed on her contact with her family and the denial of any home visit during her enrollment; (ii) FFS staged the campus for visiting parents by compelling the children, including Plaintiff, to clean and prepare it before scheduled visits, presenting to families an appearance the institution's ordinary condition did not warrant; (iii) Defendants continued to

operate FFS notwithstanding the 1990 cease and desist order, without disclosing that order to Plaintiff's family; (iv) FFS represented to Plaintiff's family that psychiatrists were on its staff and that Plaintiff was receiving psychiatric and therapeutic treatment, and billed Plaintiff's parents for each restraint and isolation of Plaintiff under a description that did not disclose what the charge was for; (v) the institution, through Defendant Brain, publicly minimized and mischaracterized its practices, including the restraint practice to which Plaintiff was subjected, in its May 2008 response to congressional oversight hearings, and, through Defendant Emmanuel Argiros, responded to the 2010 state investigation while continuing to operate as before; (vi) on information and belief, the Argiros family deliberately destroyed student records, abuse complaints, and institutional documentation, as confirmed by testimony at Geer's federal criminal trial, directly depriving Plaintiff of the evidentiary record necessary to discover and assert her claims; and (vii) on information and belief, the institution retained and never disclosed the recordings it made of Plaintiff's restraints. Plaintiff did not and could not through reasonable diligence have discovered the full scope of the enterprise within any applicable limitations period.

(b) Self-Concealing Conspiracy. The enterprise was structured to prevent victims from connecting their individual experiences to the broader enterprise. Its mechanisms of isolation, including the censorship of family contact described herein, the blackout sanctions and the denial of home visits, the staging of the campus for visiting parents, and the use of law enforcement to intercept and return students who fled, as Plaintiff herself was intercepted in New York City and returned, were themselves instruments of concealment rendering victims, including Plaintiff, structurally incapable of discovering the enterprise during enrollment or for years thereafter.

(c) Overt Acts Within the Limitations Period. The destruction of student records by the Argiros family, as established by testimony at Geer's 2025 criminal trial, constitutes an overt act in

furtherance of the conspiracy committed within the limitations period. The below-market transfer of the FFS real property by Kasos Co Family LP to Chapel Hill Land Holdings LLC in November 2014, the further transfer of an additional parcel by Defendant Emmanuel Argiros to Chapel Hill Land Holdings LLC in June 2016, and the 2014 incorporation of K9-5 Inc. immediately upon FFS's closure, each constitute further independent overt acts of asset disposition and concealment in furtherance of the conspiracy falling entirely within the limitations period. The continued concealment on the former campus property of the institutional records that survived the destruction, described herein, constitutes a further overt act of concealment in furtherance of the conspiracy continuing within the limitations period.

84. Plaintiff's claims under N.Y. Social Services Law § 483-bb are timely on the grounds set forth in Counts V and VI below, including CPLR 212(e).

85. Common-law fraud and negligent misrepresentation. Plaintiff's claims are timely under CPLR 213(8), which permits an action to be commenced within the greater of six years from the fraud or two years from discovery. The two-year discovery period runs from the discovery described above, and this action is timely under both measures.

86. All applicable statutes of limitations on Plaintiff's negligence and negligence per se claims are independently tolled by the fraudulent concealment and equitable estoppel doctrines set forth above, in addition to CPLR 208(b) as set forth above.

87. Defendants are estopped from asserting any statute of limitations defense. A defendant cannot invoke the protection of a limitations period that its own wrongful conduct caused the plaintiff to miss.

## COUNT I: CIVIL RICO (18 U.S.C. § 1962(c))

### (Against All Defendants Other Than Four Winds, Inc.)

88. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**The Enterprise.**

89. At all relevant times, Defendants constituted an enterprise within the meaning of 18 U.S.C. § 1961(4), as an association-in-fact that operated through the FFS institution as its vehicle but was structurally distinct from any individual defendant. The enterprise existed as an ongoing organization with its own staff hierarchy, marketing apparatus, referral network, physical campus, and financial infrastructure that persisted independently of any particular predicate act, and operated as a continuing unit for decades, including throughout Plaintiff's 1996-1997 enrollment.

90. Each Defendant knowingly participated in the conduct of the enterprise's affairs. FFS and Defendant Betty Argiros owned, operated, and directed the enterprise, made the decisions regarding staffing, student control, and continued operation notwithstanding the 1990 cease and desist order, and financially benefited from every aspect of the enterprise's operation. Defendant Emmanuel Argiros, as president of the FFS board throughout Plaintiff's enrollment, directed the institution's operation and the forced-labor, restraint, and sanction practices described herein and participated in the conduct of the enterprise's affairs at the institutional level. Defendants NBT Bank, N.A. and NBT Bancorp Inc. knowingly advanced and benefited from the enterprise by processing tuition payments and other financial proceeds of the enterprise, including the tuition and charges paid on Plaintiff's behalf, through NBT Bank's Village of Hancock branch, by thereafter extending secured credit to the enterprise and its property-holding entity against collateral that the children's labor, including Plaintiff's, had produced, while recklessly

disregarding the publicly available record of FFS's unlicensed operation, and by taking no corrective action of any kind following the 2025 conviction of Paul Geer. Defendant Sysco, on information and belief, advanced and benefited from the enterprise by serving as its recurring institutional food distributor, paid from the tuition-funded accounts described herein, throughout Plaintiff's enrollment and through 2014, while the children of the institution, including Plaintiff, unloaded, prepared, and served the goods it supplied. Defendant Greyhound, on information and belief, participated in the conduct of the enterprise's affairs by identifying to law enforcement a child who had fled the institution and communicating her presence on its service and its arrival time so that she could be seized and returned, by carrying her back toward the institution's custody, and by collecting the fares for that transport, thereby serving as an instrument of the runaway-recovery practice on which the enterprise's continued confinement of the children in its custody depended. Defendant Eagle Valley Search, Rescue and Recovery Team, Inc., upon information and belief, conducted its search dog operation in common with the enterprise's canine program, the Dog Corps, through their shared principal, Rita Argiros, the enterprise's Executive Program Director from 2000, and received the benefit of the children's unpaid labor within that operation and of the venture's continued operation. Defendant NATSAP lent membership legitimacy to FFS's fraudulent marketing representations. The Hancock Herald contributed to the enterprise's fraudulent marketing of FFS to the public. Defendant Jeffrey Brain participated in the conduct of the enterprise's affairs by directing the enterprise's external relations, admissions, and public representations, including the May 2008 public response to congressional oversight described herein, continuing the enterprise's fraudulent marketing and maintaining the concealment on which its continued operation depended, and by drawing his compensation for years from the proceeds of that operation. The Village of Hancock, Town of Hancock, County of Delaware,

Delaware County Sheriff's Office, and Delaware County Board of Supervisors, upon information and belief, participated in and enabled the enterprise's continued operation and concealment by permitting FFS to operate without proper licensure notwithstanding the 1990 cease and desist order and, through the runaway-recovery practice described herein, under which officers located and returned to the institution students who fled it using the intake photographs the institution supplied to them, including, as described herein, Plaintiff herself, seized in New York City with the institution's photograph and returned to it, and, pleaded in the alternative, benefited economically from the enterprise's continued operation, which brought into their communities the payroll of local residents employed by the institution, the patronage of visiting families, and the institution's recurring, tuition-funded purchasing from local suppliers. Defendants Emmanuel Argiros and Cindy Argiros continued the enterprise's pattern of concealment following FFS's 2014 closure through the below-market transfers of the FFS real property and the incorporation of Defendant K9-5 Inc. described in the Tolling section supra, transactions that dissipated the enterprise's assets and furthered its concealment from former students, including Plaintiff, with reasonably foreseeable claims arising from the conduct alleged herein. The Highlights Defendants, upon information and belief, maintained through their own author and editor, Cheripko, a continuous relationship with the enterprise, sold their publications into its purported educational program, received the benefit of the children's labor at their Wayne County retreat, and lent the enterprise the legitimacy of an established educational publisher. Defendant Chapel Hill Land Holdings LLC participated in and benefited from the enterprise's concealment by acquiring the FFS real property with notice of the claims against the transferors and by retaining undisclosed on that property, for approximately a decade and continuing to this day, the institutional records that survived the destruction described herein.

**Pattern of Racketeering Activity.**

91. Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), including the following predicate acts committed repeatedly over the course of Plaintiff's enrollment and the enterprise's decades-long operation:

(a) Mail and Wire Fraud, 18 U.S.C. §§ 1341, 1343: Defendants used the United States mail and interstate wire communications to transmit fraudulent recruitment and marketing materials and representations to placing families and referring institutions and to collect tuition payments, including the tuition and charges paid on Plaintiff's behalf from Staten Island, New York City by her parents, on information and belief by checks sent through the United States mail, in furtherance of the scheme to defraud families regarding the true nature of FFS;

(b) Money Laundering, 18 U.S.C. § 1956: Defendants processed and concealed the fraudulently obtained proceeds of the enterprise through accounts maintained at NBT Bank;

(c) Transportation of Minors, 18 U.S.C. § 2423: Defendants transported minor children in the enterprise's custody, including Plaintiff, in interstate and foreign commerce, including on the recurring out-of-state and international chorus trips described herein, among them the trip to Virginia Beach, Virginia on which Plaintiff traveled, and on the recurring FFS trips to Toronto, Ontario, Canada on which, as established by his March 3, 2025 conviction, former FFS staff member Paul Geer transported an FFS student in 2001 with the intent that the child engage in criminal sexual activity;

(d) Sexual Exploitation of Children, 18 U.S.C. §§ 2251 and 2252: in the course of the intake photography practice described herein, Education Plus Corporation, Betty Argiros, and staff acting at their direction used minors in the production of visual depictions of unclothed minors, including,

on information and belief, the photograph taken of Plaintiff in the course of her June 1996 intake strip search, employing photographic film, cameras, and materials that had been mailed, shipped, and transported in interstate and foreign commerce, and thereafter knowingly retained and possessed those depictions in books maintained by the institution through at least FFS's 2014 closure; and

(e) Forced Labor and Trafficking with Respect to Forced Labor, 18 U.S.C. §§ 1589 and 1590: Defendants Education Plus Corporation, Betty Argiros, and Emmanuel Argiros obtained Plaintiff's labor and services through physical restraint, including binding in blankets with duct tape and isolation for days at a time, the withholding of medical and psychiatric care, the withholding and manipulation of food, blackout from her family, and the scheme, plan, and pattern intended to cause Plaintiff to believe that failure to perform such labor would result in serious harm to her, including restraint, isolation, and continued and extended confinement, recruited, transported, and harbored Plaintiff and other minors, including across state lines, for that labor, and, through the school's 2014 closure, continued to obtain the labor of the minor children in the enterprise's custody by the same means, as alleged in the related actions pending in this Court and in the United States District Court for the Northern District of New York; and

**Continuity.**

92. The pattern of racketeering activity spanned multiple decades, encompassed numerous victims across the related actions described herein, and employed the same methods consistently over time, satisfying both closed-ended and open-ended continuity requirements.

**Conduct of the Enterprise.**

93. Each Defendant conducted or participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962(c).

**Causation and Damages.**

94. Plaintiff was injured in her business and property by reason of Defendants' racketeering activity. Defendants extracted from Plaintiff sixteen months of uncompensated institutional labor whose value they retained, including a permanent capital improvement to the campus, and obtained, through the fraudulent scheme described herein, the tuition and charges paid for Plaintiff's placement, on information and belief approximately one hundred thousand dollars over the course of her enrollment, including the separately billed charges for incidentals, laundry, trips, and toiletries and the charges billed for her own restraint and isolation, for treatment they never provided. Defendants further impaired Plaintiff's earning capacity by depriving her of the education for which her family was paying, by withholding her transcripts so that she could not return to high school, and by thereby delaying her high school equivalency diploma by three years and her college education by a decade. These are concrete financial injuries to Plaintiff's business and property, independent of any psychological injury and directly traceable to Defendants' racketeering. Plaintiff is entitled to recover threefold her damages, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

**Statute of Limitations.**

95. All applicable limitations periods are tolled as set forth in the Tolling section supra.

## COUNT II: RICO CONSPIRACY (18 U.S.C. § 1962(d))

**(Against All Defendants Other Than Four Winds, Inc.)**

96. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

97. Each Defendant agreed and conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly or indirectly, in the conduct of the affairs of the racketeering enterprise described in Count I through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). Each Defendant knew of the essential nature and scope of the enterprise and its scheme and knowingly agreed to participate in, facilitate, and further it. Under Salinas v. United States, 522 U.S. 52 (1997), a defendant may be liable for RICO conspiracy upon proof that it agreed to the overall objective of the conspiracy, that the enterprise's affairs be conducted through a pattern of racketeering activity, whether or not that defendant agreed to commit, or itself committed, any two or more predicate acts.

98. Each Defendant's agreement is evidenced by its own knowing, sustained participation in the scheme, as alleged in the Enterprise allegations of Count I above and incorporated here: Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros agreed to and did direct the institution's continued unlicensed operation, enrollment, and confinement of children, including Plaintiff, notwithstanding the 1990 cease and desist order, and administer the forced-labor, restraint, isolation, and sanction practices through which the enterprise's affairs were conducted; Defendants NBT Bank, N.A. and NBT Bancorp Inc. agreed to and did continue, for decades and through 2026, to maintain the enterprise's accounts, extend it secured credit, and refrain from filing any Suspicious Activity Report or making any disclosure to a regulator or law enforcement agency, despite escalating notice culminating in the 2024 indictment and 2025

conviction of Paul Geer; Defendant Sysco agreed to and did continue its recurring, tuition-funded supply relationship with the enterprise from Plaintiff's enrollment through 2014 while the children of the institution unloaded and handled the goods it supplied; Defendant Greyhound agreed to and did, on information and belief, cooperate in the identification, seizure, and return of a child who had fled the institution, and was paid for the transport; Defendant Eagle Valley agreed to and did conduct its canine operation in common with the enterprise through its own founder and president; Defendant NATSAP agreed to and did continue collecting membership dues from the enterprise while lending it the accreditation on which placing families relied; Defendant The Hancock Herald agreed to and did continue publishing content promoting the enterprise's legitimacy while omitting matters of public concern regarding its operation; Defendant Jeffrey Brain agreed to and did continue directing the enterprise's admissions and public relations, including authoring or approving the May 2008 congressional response described herein, while drawing his compensation from the enterprise's proceeds; the Highlights Defendants agreed to and did maintain their relationship with the enterprise through their embedded author and editor while selling their publications into its program; the Village of Hancock, through Hancock PD, and the other municipal Defendants agreed to and did return to the institution the children who fled it, including Plaintiff, using the photographs the institution supplied; and Defendants Emmanuel Argiros and Cindy Argiros agreed to and did, following the 2014 closure, direct the disposition of the enterprise's remaining assets through Kasos Co Family LP, Kasos Enterprises LLC, Chapel Hill Land Holdings LLC, and K9-5 Inc., in furtherance of the concealment alleged herein.

99. Overt acts committed in furtherance of the conspiracy, within the applicable limitations period, include: the deliberate destruction of student records, abuse complaints, and other institutional documentation by the Argiros family, as confirmed by testimony at Paul Geer's 2025 federal

criminal trial; the November 2014 below-market conveyance of the FFS real property by Kasos Co Family LP to Chapel Hill Land Holdings LLC; the June 2016 conveyance of an additional parcel by Defendant Emmanuel Argiros to Chapel Hill Land Holdings LLC; the 2014 incorporation of Defendant K9-5 Inc. immediately upon FFS's closure; Chapel Hill Land Holdings LLC's continued concealment, for approximately a decade following the 2014 closure, of surviving institutional records on the former campus property, until the recovery of part of those records by federal law enforcement pursuant to a search warrant, and its continued retention on that property, to this day, of the records not recovered; and NBT Bank's continued maintenance of, and failure to report or disclose, the enterprise's account relationships following the 2024 indictment and March 3, 2025 conviction of Paul Geer, a course of silence continuing through 2026 and through the filing of this action. Each of these acts was committed within the limitations period and independently satisfies the overt-act requirement of the conspiracy alleged in this Count.

100. Plaintiff was injured in her business and property by reason of the predicate acts of racketeering, and the overt acts, committed in furtherance of the conspiracy alleged in this Count, in the same respects set forth in Count I above, and is entitled to recover threefold the damages she sustained, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c). All applicable limitations periods are tolled as set forth in the Tolling section supra.

## COUNT III: FORCED LABOR, 18 U.S.C. §§ 1589 AND 1595

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)**

101. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

102. Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros, acting through the staff members and senior students described herein, knowingly obtained Plaintiff's labor and services, including her dish crew and waitstaff duty, her cleaning crew assignments, her stripping and waxing of the institution's floors, her cleaning of its office, her snow shoveling, her carrying of rocks, her construction with other children of the deck outside the student trailer, her unloading of the institution's commercial food deliveries, and her staging of the campus before parents visited, by means of force and physical restraint, including confinement to the campus, restraint by staff and senior students, binding in blankets with duct tape, and isolation for days at a time without access to a toilet; by means of a scheme, plan, or pattern intended to cause Plaintiff to believe that, if she did not perform such labor, she would suffer serious harm, including restraint and isolation, the withholding and manipulation of food, the withholding of medical and psychiatric care, blackout from her family, confinement to a corner, sanction, the extension of her confinement, and her interception and return by law enforcement if she fled, as in fact occurred; and by means of the abuse of the position of legal custody and control Defendants held over Plaintiff, a minor throughout her enrollment.

103. As a direct and proximate result of this forced labor, Plaintiff suffered the injuries described herein and is entitled to recover damages, including punitive damages where applicable, together with reasonable attorneys' fees and costs, pursuant to 18 U.S.C. § 1595(a). All applicable limitations periods are tolled as set forth supra.

## COUNT IV: NBT BANK OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT

## (18 U.S.C. §§ 1591(d) AND 1595)

**(Against NBT Bank, N.A. and NBT Bancorp Inc.)**

104. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

105. At all relevant times, NBT Bank maintained accounts for Education Plus Corporation d/b/a Family Foundation School and for the Argiros Defendants individually, through which the financial proceeds of the enterprise were deposited, transferred, and disbursed.

106. 18 U.S.C. § 1591(d) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition. NBT Bank obstructed, attempted to obstruct, and interfered with that enforcement by maintaining the FFS account relationship and continuing to process the enterprise's financial transactions without filing a Suspicious Activity Report and without terminating that relationship, notwithstanding constructive notice from the public record beginning no later than the 1990 cease and desist order, the secured-lender knowledge arising from the blanket security interests described herein, beginning in 2002, the knowledge of its Hancock branch manager, Dawn Joyce, who administered the School's accounts and credit and served under the School's president as a director of the corporation the bank sponsored, which is the bank's own knowledge, and the March 24, 2010 loan against the campus, official notice upon the December 29, 2010 joint findings of four New York State agencies that former students' accounts of abusive practices at the institution over the preceding decade were credible, findings issued in the same year as the bank's March 24, 2010 loan against the campus, escalated notice upon the enterprise's 2014 closure amid publicized abuse allegations, and actual notice upon the 2024 federal indictment

of Paul Geer for federal sex offenses committed against FFS students, notice renewed and confirmed upon his conviction on March 3, 2025 after a public two-week trial. At each stage, NBT Bank's obligations of customer due diligence and suspicious-activity reporting required inquiry, and that obligation was independent of and did not await any request from law enforcement and arose anew at each stage; at each stage, the bank chose the continued receipt of fees over compliance.

107. The obstruction is a continuing violation: following both Geer's indictment and his conviction, no report has been made, no disclosure has issued, and no corrective action has been taken, through 2025 and into 2026 and through the filing of this action, and each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period.

108. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: NBT Bank's conduct sustained the concealment that delayed Plaintiff's discovery and assertion of her claims and facilitated the dissipation of the assets against which her recovery must be had, injuries accruing after Plaintiff's enrollment and continuing through the filing of this action. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against NBT Bank, N.A. and NBT Bancorp Inc., jointly and severally. All applicable limitations periods are tolled as set forth supra.

## COUNT V: NY SOC. SERV. LAW § 483-bb (CHILD VICTIMS OF LABOR TRAFFICKING)

**(Against All Defendants)**

109. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

110. N.Y. Social Services Law § 483-bb(c) provides a civil cause of action to an individual who is a victim of conduct prohibited by N.Y. Penal Law §§ 135.35 (labor trafficking) and 135.37 (aggravated labor trafficking), and permits recovery not only against the perpetrator of such conduct but also against whoever knowingly advances or profits from, or should have known he or she was advancing or profiting from, an act in violation of those provisions.

111. While a minor in Defendants' custody, Plaintiff was the victim of labor trafficking: she was recruited from Staten Island through the hospital referral described herein, transported to Hancock, and harbored at FFS on the misrepresentations described herein, and she was compelled to provide labor and services, including the dish crew, waitstaff, cleaning crew, floor stripping and waxing, office cleaning, snow shoveling, rock carrying, deck construction, delivery unloading, and campus staging labor described herein, by means of physical restraint, including binding in blankets with duct tape and isolation for days at a time, the withholding and manipulation of food, the withholding of her psychiatric medication and of medical care, blackout from her family and from other students, the denial of any home visit, the censorship of her family contact, the interception and return of Plaintiff by law enforcement when she fled, and the institutional sanction regime, under which any resistance extended her confinement. The gravamen of this Count is the trafficking and forced labor itself; the strip searches, photographing, and gender-based control alleged herein are pleaded as instruments of that coercion, and Plaintiff's claims for the offenses committed against her person are pleaded separately in Count XII pursuant to CPLR 208(b).

112. Each Defendant engaged in, advanced, or profited from, or should have known it was advancing or profiting from, that labor trafficking, in the same respects and for the same reasons set forth as to each Defendant in the Enterprise allegations of Count I. Education Plus Corporation, Betty Argiros, and Emmanuel Argiros directed the operation and retained the value of the

children's labor, which ran the institution and displaced the wages a lawful residential school must pay; NBT Bank, N.A. and NBT Bancorp Inc. profited from the account relationships through which the proceeds of the operation, including the tuition and charges paid on Plaintiff's behalf, were deposited, processed, and disbursed, and from the secured credit whose collateral was, in substantial part, the product of the children's labor, as further alleged in Count VI; Kasos Co Family LP, Kasos Enterprises LLC, Chapel Hill Land Holdings LLC, and K9-5 Inc. held, received, and continue to hold and benefit from property and assets of the operation, including property improved and maintained by student labor, including the deck Plaintiff and other children built and the floors she stripped and waxed; Eagle Valley Search, Rescue and Recovery Team, Inc., upon information and belief, profited from the unpaid labor of the enterprise's children in the canine operation conducted in common with it by its own founder and president, and from the continued operation of the venture that labor sustained; Four Winds, Inc., on information and belief, advanced that labor trafficking by discharging Plaintiff and other adolescent inpatients to FFS and profited from doing so, and should have known it was advancing and profiting from it, for the reasons set forth in its party paragraph above; Sysco profited from, and should have known it was profiting from, that labor trafficking, receiving years of recurring institutional sales revenue paid from the operation's tuition-funded accounts while the children of the institution, including Plaintiff, unloaded, prepared, and served the goods it supplied, in the immediate presence of its own drivers; Greyhound advanced that labor trafficking by, on information and belief, identifying Plaintiff to law enforcement as a passenger on its service so that she could be seized and returned to the institution and its labor regime, and by carrying her back toward it, and profited from the fares paid for that transport; the Highlights Defendants, upon information and belief, advanced the trafficking through their continuous relationship with the enterprise's embedded staff and profited

from the enterprise's purchases of their publications and from the labor of its children at their retreat; NATSAP received membership dues from FFS while lending it the institutional legitimacy on which placing families relied; The Hancock Herald profited from its promotional relationship with the operation; Jeffrey Brain profited from and advanced that labor trafficking, drawing his compensation from an operation whose revenues, facilities, and going-concern value were the product of the labor of its students, including Plaintiff, and advancing, through the public concealment described herein, the operation's continuation; and the Village of Hancock, the Town of Hancock, the County of Delaware, the Delaware County Sheriff's Office, and the Delaware County Board of Supervisors advanced that trafficking by permitting the institution's continued, unlicensed operation within their jurisdictions notwithstanding the official notice described herein, and by locating and returning to the institution students who fled it, using the intake photographs the institution supplied to them, including, as described herein, Plaintiff herself, and, pleaded in the alternative, profited from that continued operation as alleged in Count I.

113. Social Services Law § 483-bb(c)(ii) provides that an action under that subdivision shall be commenced within fifteen years of the date on which the trafficking victim was freed from the trafficking situation or, if the victim was a minor when the act of human trafficking occurred, within fifteen years after the date the victim attains the age of majority, and CPLR 212(e) provides that the period does not begin to run, and is tolled, during any period in which the victim is or remains subject to such conduct, as Plaintiff remained through October 1997. Section 483-bb(c)(iii) provides that if a person entitled to sue is under a disability at the time the cause of action accrues, so that it is impossible or impracticable for her to bring the action, the time of the disability is not part of the time limited for the commencement of the action, and that disability tolls the running of the statute; § 483-bb(c)(iii)(A) defines disability to include being a minor, lacking legal

capacity to make decisions, imprisonment, or other incapacity or incompetence. Section 483-bb(c)(iii)(C) estops a perpetrator from asserting the statute of limitations where its expiration is due to conduct by the perpetrator inducing the victim to delay the filing of the action or to threats causing duress upon the victim. Section 483-bb(c)(iv) provides that the running of the statute may be suspended where the person entitled to sue could not reasonably have discovered the cause of action due to circumstances resulting from the trafficking situation, such as psychological trauma, cultural and linguistic isolation, and the inability to access services. Section 483-bb(c)(iii)(D) provides that the suspension of the statute of limitations due to disability, lack of knowledge, or estoppel applies to all other related claims arising out of the trafficking situation. Each of those provisions applies here. First, disability under § 483-bb(c)(iii) and (iii)(A): Plaintiff was a minor throughout the trafficking situation, which alone tolls the running of the statute under the express terms of the section, and in the years that followed, as described herein, she was under other incapacity within the meaning of § 483-bb(c)(iii)(A), including the three suicide attempts in 1999, the psychiatric hospitalization in 2005 and her other psychiatric admissions, and the seventeen admissions to substance-abuse treatment described herein, during which it was impossible or impracticable for her to bring this action. Second, lack of knowledge under § 483-bb(c)(iv): Plaintiff could not reasonably have discovered her cause of action, the coordinated character of the enterprise, or the identity of those who advanced and profited from it, due to circumstances resulting from the trafficking situation, namely the psychological trauma described herein, the isolation from her family and from outside services to which the institution subjected her during her enrollment, her inability to access mental-health and other services in the years that followed, and the concealment described herein, and she did not publicly disclose what had been done to her at FFS until approximately 2013. Third, estoppel under § 483-bb(c)(iii)(C): Defendants'

concealment, including the censorship of Plaintiff's family contact, the blackout sanctions and the denial of any home visit, the staging of the campus for her parents, the interception and return of Plaintiff when she fled, the destruction and concealment of records, the May 2008 public minimization of the restraint practice to which she was subjected, and the concealment of the enterprise's coordinated character until 2025, induced the delay in the filing of this action, and the institution's threats, including its use of law enforcement to seize her when she fled and its binding of her in blankets and duct tape when she resisted, caused duress upon her, so that Defendants are estopped from asserting the limitations defense. Fourth, under § 483-bb(c)(iii)(D), each such suspension, whether for disability, lack of knowledge, or estoppel, applies to all other related claims arising out of the trafficking situation, including every other claim pleaded in this Complaint. Plaintiff is entitled to compensatory and punitive damages, attorneys' fees, and costs against the Defendants named in this Count, jointly and severally.

## COUNT VI: KNOWING PROFIT FROM CHILD LABOR TRAFFICKING THROUGH SECURED CREDIT AGAINST THE PRODUCT OF THE CHILDREN'S LABOR (N.Y. SOC. SERV. LAW § 483-bb)

**(Against NBT Bank, N.A. and NBT Bancorp Inc.)**

114. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

115. N.Y. Social Services Law § 483-bb(c) extends civil liability to whoever knowingly profits from, or should have known he or she was profiting from, labor trafficking in violation of N.Y. Penal Law §§ 135.35 and 135.37. NBT Bank, N.A. profited, and should have known it was profiting, from the labor trafficking of the children in FFS's custody, including Plaintiff, in a

manner distinct from the account relationship alleged in Count V: the bank took, held, and enforced a direct financial stake in the product of the children's labor itself.

116. The operation of FFS was built, maintained, and improved by the uncompensated labor of the children confined there. The campus real property, its structures, grounds, and improvements, including the trailers in which students were housed and the deck outside Plaintiff's trailer, which Plaintiff and other children constructed during her enrollment, the gravel road to the institution's chapel that the children refilled as it wore down, the grounds the children landscaped, the buildings the children painted and stained, and the floors she and other children stripped, waxed, and maintained, and the institution's equipment, inventory, and fixtures, were the product of that labor, which displaced the paid labor a lawful residential school must purchase and thereby created the operation's margin, its going-concern value, and the value of its physical plant. That labor-built property became the bank's collateral. Beginning in 2002, and again in 2004, 2006, and 2008, NBT Bank took blanket security interests in Education Plus Corporation's operating assets, including its equipment, inventory, accounts, general intangibles, and contract rights and their proceeds, and on March 24, 2010 it recorded a loan of six hundred eighty thousand dollars to Kasos Co Family LP secured by the campus itself, continuing those filings through 2013 and, by continuation filed on September 15, 2016, holding its lien on the operation's collateral every day through December 18, 2021, seven years after the school closed. The forced labor alleged herein directly enhanced the value of the collateral securing the bank's own position, and the bank held, through its liens and its mortgage, a direct financial stake in the product of that labor, from which it earned interest and fees and from which, on information and belief, it collected satisfaction of its credit upon the 2014 conveyance of the campus.

117. Plaintiff's own labor is part of that collateral. The trailers and the deck she and other children built are permanent structures and improvements on the very real property against which the bank lent and in which it held its security; the chapel road she regraveled, the grounds she landscaped, and the surfaces she painted and stained are improvements to that property; and the floors she stripped and waxed were the maintenance of that property, so that the bank held a lien on, and profited from, the product of Plaintiff's own forced labor. On information and belief, the underwriting of secured credit against the campus required the bank to appraise, inspect, and review the financial condition of the operation and the property, which would have disclosed the operation's dependence on the labor of the children confined there; alternatively, if the bank extended that credit without the underwriting its own standards required, its departure from those standards constituted the deliberate avoidance of knowledge. On either footing, the bank knew or should have known that the collateral it took, and the repayment it received, were the product of the labor of trafficked children.

118. This Count is timely on the grounds set forth in Count V and in the Tolling section supra, including CPLR 212(e) and the statutory suspensions of Social Services Law § 483-bb(c). Plaintiff is entitled to compensatory and punitive damages, attorneys' fees, and costs against NBT Bank, N.A. and NBT Bancorp Inc., jointly and severally.

## COUNT VII: OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT BY DESTRUCTION OF RECORDS (18 U.S.C. §§ 1591(d) AND 1595)

**(Against Education Plus Corporation and Emmanuel Argiros)**

119. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

120. 18 U.S.C. § 1591(d) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

121. As confirmed by testimony at Paul Geer's 2025 federal criminal trial, including the trial testimony of Defendant Emmanuel Argiros himself, the Argiros family deliberately destroyed student records, abuse complaints, and other institutional documentation of FFS, in and around the school's 2014 closure, including the institution's documentation of student abuse complaints concerning conduct of the kind for which Paul Geer was thereafter federally indicted, prosecuted, and convicted under 18 U.S.C. § 1591 and related provisions, and including, on information and belief, records concerning Plaintiff's own enrollment, the strip searches and photographing of Plaintiff, the photograph itself, her restraints and isolation and the recordings made of them, her medical and psychiatric treatment and the discontinuation of her medication, and the institution's representations to her family. That destruction was carried out by and at the direction of Defendant Emmanuel Argiros and members of the Argiros family acting for Education Plus Corporation, and, on information and belief, extended to records released to the Argiros family by the purchaser of the campus after the closure, and it obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1591 by destroying the evidentiary record of the complaints against Geer and others on which that enforcement depended.

122. The obstruction is a continuing violation: the destroyed records have never been restored, reconstructed, or disclosed; no disclosure of the destruction or of the contents of the destroyed files has been made to any regulator, investigator, or law enforcement agency; and the concealment the destruction achieved has been maintained through Geer's 2024 indictment, his conviction on

March 3, 2025, and the filing of this action, each month of that continued concealment constituting a fresh act of obstruction within the limitations period.

123. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: the destruction of the institution's records deprived Plaintiff and her family of the evidentiary record to which she was entitled, prolonged the concealment that delayed her discovery of her claims until 2025, and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against the Defendants named in this Count, jointly and severally. All applicable limitations periods are tolled as set forth supra.

## COUNT VIII: OBSTRUCTION OF FORCED LABOR AND LABOR TRAFFICKING ENFORCEMENT BY DESTRUCTION OF RECORDS (18 U.S.C. §§ 1590(b) AND 1595)

**(Against Education Plus Corporation and Emmanuel Argiros)**

124. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

125. 18 U.S.C. § 1590(a) prohibits knowingly recruiting, harboring, transporting, providing, or obtaining any person for labor or services in violation of chapter 77 of Title 18, and 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of that section. 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

126. As alleged herein, the operation of FFS recruited, harbored, transported, and obtained minor children, including Plaintiff, for labor and services. The records destroyed by and at the direction of

Defendant Emmanuel Argiros and members of the Argiros family acting for Education Plus Corporation, as described in Count VII, included, on information and belief, the institution's student files, sanction and work-crew records, billing records, and complaint records documenting the forced-labor conduct described herein, including the work sanctions, restraints, and isolation to which Plaintiff and other students were subjected and the charges billed to their families for them. That destruction obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590 by destroying the evidentiary record of the operation's forced-labor conduct on which that enforcement depended. No enforcement action under 18 U.S.C. § 1590 has ever been brought against the operation or its principals; the concealment the destruction achieved prevented that enforcement.

127. The obstruction is a continuing violation: the destroyed records have never been restored, reconstructed, or disclosed; no disclosure of the destruction or of the contents of the destroyed files has been made to any regulator, investigator, or law enforcement agency; and the concealment the destruction achieved has been maintained through Geer's 2024 indictment, his conviction on March 3, 2025, and the filing of this action, each month of that continued concealment constituting a fresh act of obstruction within the limitations period.

128. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: the destruction of the institution's records deprived Plaintiff and her family of the evidentiary record to which she was entitled concerning the forced-labor operation described herein, prolonged the concealment that delayed her discovery of her claims until 2025, and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive

damages, attorneys' fees, and costs against the Defendants named in this Count, jointly and severally. All applicable limitations periods are tolled as set forth supra.

## COUNT IX: OBSTRUCTION OF LABOR TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1590(b) AND 1595)

**(Against NBT Bank, N.A. and NBT Bancorp Inc.)**

129. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

130. 18 U.S.C. § 1590(a) prohibits knowingly recruiting, harboring, transporting, providing, or obtaining any person for labor or services in violation of chapter 77 of Title 18, and 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of that section. 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

131. As alleged herein, the operation of FFS recruited, transported, harbored, and obtained minor children, including Plaintiff, for labor and services, and NBT Bank maintained the accounts through which the financial proceeds of that operation were deposited, transferred, and disbursed. NBT Bank obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590 by maintaining that account relationship and continuing to process the operation's financial transactions without filing a Suspicious Activity Report and without terminating that relationship, notwithstanding constructive notice from the public record beginning no later than the 1990 cease and desist order, the secured-lender knowledge arising from the blanket security interests described herein, beginning in 2002, the knowledge of its Hancock branch manager, Dawn Joyce, who administered the School's accounts and credit and served under the School's president as a director of the corporation the bank sponsored, which is the bank's own knowledge, and the March 24,

2010 loan against the campus that the children's labor had improved, underwritten, on information and belief, on the appraisal and inspection of that campus and the review of the operation's finances, or, alternatively, extended without the underwriting the bank's own standards required, official notice upon the December 29, 2010 joint findings of four New York State agencies that former students' accounts of abusive practices at the institution over the preceding decade were credible, findings issued in the same year as the bank's March 24, 2010 loan against the campus, escalated notice upon the enterprise's 2014 closure amid publicized abuse allegations, and actual notice upon the 2024 federal indictment of Paul Geer, notice renewed and confirmed upon his conviction on March 3, 2025. The bank's obligation to report was independent of and did not await any request from law enforcement and arose anew at each stage. No enforcement action under 18 U.S.C. § 1590 has ever been brought against the operation or its principals; the concealment the bank's conduct sustained prevented that enforcement.

132. The obstruction is a continuing violation: following both Geer's indictment and his conviction, no report has been made, no disclosure has issued, and no corrective action has been taken, through 2025 and into 2026 and through the filing of this action, and each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period.

133. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: NBT Bank's conduct sustained the concealment that delayed Plaintiff's discovery and assertion of her claims arising from the forced-labor operation described herein and facilitated the dissipation of the assets against which her recovery must be had, injuries accruing after Plaintiff's enrollment and continuing through the filing of this action. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees,

and costs against NBT Bank, N.A. and NBT Bancorp Inc., jointly and severally. All applicable limitations periods are tolled as set forth supra.

## COUNT X: NEGLIGENT FAILURE TO PROVIDE PROMISED THERAPEUTIC SERVICES, FRAUDULENT AND NEGLIGENT MISREPRESENTATION, N.Y. GEN. BUS. LAW § 349

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)**

134. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein. These claims are pleaded simultaneously with, and without prejudice to, all other theories of liability set forth in this Complaint pursuant to Federal Rule of Civil Procedure 8(d).

135. Defendants owed Plaintiff a distinct duty of reasonable care arising from their express representations, made to Plaintiff's mother and stepfather, that FFS would provide qualified psychiatric and therapeutic treatment to Plaintiff, a girl who had just been stabilized on lithium in a psychiatric hospital and who was under a psychiatrist's care and on prescribed medication, and that psychiatrists were on its staff. That duty was breached by Defendants' total failure to employ qualified professionals or deliver any of the promised services, by the discontinuation of the lithium on which Plaintiff had been stabilized without any psychiatric evaluation, and by FFS's substitution of forced labor, restraint, isolation, food manipulation, and gender-based degradation for any genuine treatment of Plaintiff.

136. Defendants breached their duty of reasonable care by: (a) failing to employ any qualified psychiatric, psychological, or licensed therapeutic professionals, notwithstanding the representation to Plaintiff's parents that psychiatrists were on staff; (b) failing to conduct any

meaningful evaluation, diagnosis, or treatment planning for Plaintiff; (c) discontinuing the lithium on which Plaintiff had been stabilized, without qualified oversight, tapering, or follow-up, and leaving her without psychiatric care thereafter; (d) substituting forced labor, restraint and isolation, food manipulation, and gender-based degradation for genuine treatment; (e) keeping Plaintiff at the institution with an untreated high fever for days before seeking medical care; (f) subjecting Plaintiff to an intake strip search and photographing her, and strip searching her again upon her return, without medical screening, parental consent, or lawful authority; (g) compelling Plaintiff to consume food to which she was allergic and placing her on half portions; (h) housing Plaintiff in a trailer without a fire alarm and locking students inside it at night; (i) ignoring the sexual-assault trauma Plaintiff carried into the institution, which required treatment, and instead compounding it and using it against her in the staff-run “table topics” sessions described herein; (j) responding to Plaintiff’s self-harm with punishment rather than care; and (k) continuing to enroll and confine students, including Plaintiff, notwithstanding the 1990 cease and desist order. Defendants’ representations that FFS was a qualified therapeutic institution staffed with psychiatrists constitute deceptive acts and practices within the meaning of N.Y. General Business Law § 349, directed at consumers generally through FFS’s marketing materials and causing Plaintiff’s family the actual injury of tuition and charges paid for services never rendered.

137. As a direct and proximate result of Defendants’ negligent, fraudulent, and deceptive conduct, independently of any other theory of liability in this Complaint, Plaintiff suffered the injuries described herein and is entitled to compensatory damages and punitive damages. This claim is timely pursuant to CPLR 213(8) and N.Y. General Business Law § 349(c), as set forth in the Tolling section supra.

## COUNT XI: NEGLIGENCE AND NEGLIGENT SUPERVISION, HIRING, AND RETENTION

### (Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)

138. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein. Pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d), and without prejudice to the intentional conduct theories set forth in the preceding and following counts, Defendants owed Plaintiff and other enrolled minor students a non-delegable duty of reasonable care, including a duty to protect students from foreseeable harm caused by FFS staff and by the institution’s own custodial, disciplinary, and medical practices.

139. Defendants breached that duty by, among other things: continuing to operate and enroll students, including Plaintiff, notwithstanding the 1990 cease and desist order; accepting into their custody, and soliciting through a psychiatric hospital the placement of, a sixteen-year-old who had just been stabilized on psychiatric medication without any qualified clinical staff to treat her; directing, permitting, and conducting an intake strip search and photographing of Plaintiff, and a second strip search upon her return, without medical screening, parental consent, or lawful authority; discontinuing the lithium on which Plaintiff had been stabilized without qualified oversight or follow-up; adopting and enforcing a restraint and isolation practice under which minor students, including Plaintiff, were bound in blankets with duct tape by staff and senior students and left for days without access to a toilet; delegating the physical restraint of children to other children; imposing sustained forced labor on Plaintiff; compelling Plaintiff’s consumption of food to which she was allergic and placing her on half portions; hiring, retaining, and placing in unsupervised

authority over children Paul Geer, whose sexualized conduct toward the minors in his charge was open and known within the institution and for which he was convicted in 2025, and the staff who administered the restraint, sanction, and family-contact practices described herein; keeping Plaintiff at the institution with an untreated high fever for days; housing Plaintiff in a trailer without a fire alarm; and procuring the seizure and return of a minor who had fled the institution rather than inquiring into the conditions from which she fled. This conduct created an unreasonable and foreseeable risk of harm directly and proximately causing the injuries Plaintiff sustained.

140. As a direct and proximate result of Defendants' negligence, Plaintiff suffered the injuries described herein and is entitled to compensatory and punitive damages. All applicable statutes of limitations are tolled as set forth supra, including pursuant to CPLR 208(b).

## COUNT XII: ASSAULT, BATTERY, FALSE IMPRISONMENT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)**

141. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

142. The intake strip search to which Plaintiff was subjected, including the inspection of her unclothed body while she squatted and coughed and the photographing of her before she had been permitted to dress, constituted a battery upon her, then a sixteen-year-old minor, without consent or lawful justification, as did the second strip search to which she was subjected upon her return from New York City. The searches were conducted pursuant to the uniform intake and re-entry policy adopted, directed, and enforced by Defendants Education Plus Corporation and Betty Argiros, and these Defendants are directly liable, together with the staff who carried them out, for the batteries

committed in execution of that policy. The staff and the senior students acting at their direction who restrained Plaintiff, wrapped her in blankets, bound her with duct tape, and left her so bound in the room off the boot closet for days at a time without access to a toilet, the staff who forced Plaintiff to eat fish to which she was allergic, and the staff who confined her to the campus and to the institution's custody against her will throughout her enrollment, including by procuring her seizure in New York City and her return, committed battery and false imprisonment upon Plaintiff. Each such act was performed in execution of the intake, sanction, restraint, isolation, and food policies adopted, directed, and enforced by the Defendants named in this Count and within the scope of the duties they assigned, and these Defendants are directly and vicariously liable for them.

143. Independently, the course of conduct described herein, including the intake strip search and photographing of Plaintiff and the second strip search upon her return, the restraints, duct-tape binding, and days-long isolation without access to a toilet, the videotaping of those restraints, the discontinuation of Plaintiff's psychiatric medication, the sustained forced labor, the forced consumption of food to which she was allergic and the half portions, the blackout from her family and from all male students and the denial of any home visit, the dress-down sanctions and the sexually explicit conversation directed at a minor, the seizure of Plaintiff in New York City by means of the institution's photograph and her return to those conditions, the days she was kept with an untreated high fever, and the withholding of her transcripts, was extreme and outrageous, was undertaken intentionally or with reckless disregard of the substantial certainty that it would cause severe emotional distress, and did cause Plaintiff severe and ongoing emotional distress.

144. As a direct and proximate result, Plaintiff suffered the injuries described herein and is entitled to compensatory and punitive damages from the Defendants named in this Count jointly and

severally. All applicable statutes of limitations are tolled as set forth supra, including pursuant to CPLR 208(b).

## COUNT XIII: COMMON-LAW FRAUD AND FRAUDULENT CONCEALMENT (CPLR 213(8))

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Jeffrey Brain)**

145. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

146. Defendants Education Plus Corporation and Betty Argiros knowingly made material misrepresentations of fact to Plaintiff's mother and stepfather, including that FFS was a qualified therapeutic boarding school staffed to provide treatment, psychological and psychiatric services, and a supervised residential environment, that psychiatrists were on its staff, that Plaintiff would receive qualified treatment for the condition for which she had been hospitalized and stabilized on medication, that Plaintiff would complete her high school education, and that Plaintiff was making therapeutic progress. Each of these representations was false when made, was known by these Defendants to be false, and was made with the intent that Plaintiff's parents rely upon it. The billing of Plaintiff's restraints and isolation under a description that did not disclose what the charge was for was a further misrepresentation made with the same intent.

147. Plaintiff's mother and stepfather reasonably relied on those misrepresentations, procuring and paying for Plaintiff's placement, surrendering Plaintiff to Defendants' custody, and continuing to do so, and paying the charges billed for her restraint and isolation without knowing what they were, and paying the separately billed charges for incidentals, laundry, trips, and toiletries described herein. Plaintiff's mother, a nurse, was never told of the 1990 cease and desist order or of the

investigations of the institution that preceded Plaintiff's enrollment, and would not have placed Plaintiff at FFS had she known of them. Defendants reinforced and concealed the fraud through the devices described herein, including the institution's instruction to Plaintiff's mother that its students would lie and say anything to be taken out, on which her mother relied in returning Plaintiff to FFS after Plaintiff had told her of the abuse, the monitoring and censorship of Plaintiff's family contact, the blackout sanctions and the denial of any home visit, the staging of the campus before her parents' visits, the May 2008 public minimization of the institution's practices, and the destruction of institutional records, so that the true conditions of her confinement could not be discovered.

148. Defendants Emmanuel Argiros and Cindy Argiros separately and independently perpetuated that concealment following FFS's 2014 closure. Through the transfers described in the Tolling section supra, and through their purposeful silence following the 2025 public disclosure of the enterprise's conduct at Geer's federal criminal trial, Defendants Emmanuel Argiros and Cindy Argiros took no step to disclose, correct, or come forward with the truth concerning the conduct to which Plaintiff and other FFS students had been subjected, notwithstanding their knowledge of it, and instead moved the enterprise's remaining assets beyond the reach of the students, including Plaintiff, who had been defrauded and injured. Defendant Jeffrey Brain furthered that concealment through the May 2008 congressional response described herein.

149. As a direct and proximate result, Plaintiff suffered the pecuniary and personal injuries described herein. This claim is timely pursuant to CPLR 213(8), which permits commencement within two years of the discovery of the fraud, measured here from Plaintiff's discovery of the fraud through the evidence and testimony adduced at the February 2025 federal criminal trial of

Paul Geer, and on the Tolling allegations set forth supra. Plaintiff is entitled to compensatory and punitive damages from the Defendants named in this Count jointly and severally.

**COUNT XIV: FRAUDULENT CONVEYANCE (N.Y. DEBTOR & CREDITOR LAW)**

**(Against Emmanuel Argiros, Cindy Argiros, Kasos Co Family LP, Kasos Enterprises LLC, Chapel Hill Land Holdings LLC, and K9-5 Inc.)**

150. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

151. At the time of the transfers described herein, Defendants Emmanuel Argiros and Cindy Argiros, acting through Kasos Co Family LP and Kasos Enterprises LLC, faced reasonably foreseeable claims from former FFS students, including Plaintiff, arising from the conduct alleged in this Complaint. In November 2014, Kasos Co Family LP conveyed the FFS real property to Defendant Chapel Hill Land Holdings LLC for consideration materially below the property's value, and in June 2016 Defendant Emmanuel Argiros conveyed an additional parcel to Chapel Hill Land Holdings LLC. Defendant K9-5 Inc. was incorporated in 2014, immediately upon FFS's closure, and received assets of the enterprise.

152. These conveyances were made without fair consideration and rendered the transferors unable to satisfy reasonably foreseeable claims, including Plaintiff's, and were made with actual intent to hinder, delay, or defraud creditors and claimants of the enterprise, including Plaintiff, within the meaning of the New York Debtor and Creditor Law. Defendant Chapel Hill Land Holdings LLC took the FFS real property with actual or constructive notice of the claims against the transferors.

153. Plaintiff is entitled to have these conveyances set aside or, in the alternative, to a money judgment against the transferee Defendants to the extent of the value of the property fraudulently conveyed, together with reasonable attorneys' fees and costs.

## COUNT XV: COMMON-LAW AIDING AND ABETTING FRAUD

**(Against NBT Bank, N.A. and NBT Bancorp Inc.)**

154. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

155. As set forth in Count XIII, Education Plus Corporation and the Argiros Defendants perpetrated a fraud upon Plaintiff and her family through material misrepresentations concerning the nature of FFS and the services for which they charged, upon which Plaintiff's family relied to their detriment.

156. NBT Bank, N.A. and NBT Bancorp Inc. had actual knowledge of that fraud. As alleged herein, the bank maintained the enterprise's accounts, in the community in which it operated, for decades spanning Plaintiff's enrollment, and thereafter financed it as its secured lender against collateral the children's labor had produced; possessed escalating notice through the August 1990 public cease and desist order, the 2008 congressional hearings, the December 2010 joint findings of four New York State agencies, the 2014 closure of FFS, and the 2025 federal conviction of Paul Geer; and thereafter, on information and belief, purposely concealed its own involvement, filing no Suspicious Activity Report and making no disclosure to any regulator or law enforcement agency even after judicial confirmation of the enterprise's conduct.

157. The bank substantially assisted the fraud by maintaining the accounts through which the fraudulently obtained tuition, including the tuition and charges paid on Plaintiff's behalf, was

collected and disbursed; by processing those transactions for decades; by extending secured credit to the enterprise; and by lending the enterprise the appearance of ordinary commercial legitimacy.

158. As a direct and proximate result, Plaintiff suffered the pecuniary and personal injuries described herein. This claim is timely pursuant to CPLR 213(8), measured from Plaintiff's discovery as alleged supra, and all applicable statutes of limitations are otherwise tolled as set forth supra. Plaintiff is entitled to compensatory and punitive damages from the Defendants named in this Count jointly and severally.

## COUNT XVI: TRAFFICKING WITH RESPECT TO FORCED LABOR (18 U.S.C. §§ 1590 AND 1595)

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)**

159. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

160. Throughout Plaintiff's enrollment, from June 1996 through her departure in October 1997, Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros knowingly recruited Plaintiff through the hospital referral and the representations to her parents described herein, caused and directed her transport from the referring hospital to the FFS campus, harbored, maintained, and obtained Plaintiff, a minor in their custody, for labor and services in violation of 18 U.S.C. § 1589, including the dish crew, waitstaff, cleaning, floor, office, snow, rock, deck-construction, delivery-unloading, and campus-staging labor described herein, transported her out of and back into the State of New York on the Virginia Beach trip described herein, held her at the FFS campus under the regime of confinement, restraint, isolation, blackout, censored family contact, and institutional sanction alleged herein, and, when she fled, procured her

seizure in New York City and her transport back to the campus by means of the photograph they had taken of her, in violation of 18 U.S.C. § 1590.

161. As a direct and proximate result, Plaintiff suffered the injuries described herein and is entitled to recover damages, including punitive damages where applicable, together with reasonable attorneys' fees and costs, pursuant to 18 U.S.C. § 1595(a). All applicable limitations periods are tolled as set forth supra.

## COUNT XVII: OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT BY CONCEALMENT OF RECORDS (18 U.S.C. §§ 1591(d) AND 1595)

**(Against Chapel Hill Land Holdings LLC)**

162. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

163. 18 U.S.C. § 1591(d) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

164. Chapel Hill Land Holdings LLC obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1591 by harboring and concealing the surviving records of the enterprise. Upon acquiring the FFS campus in November 2014, Chapel Hill Land Holdings LLC held on that property, in an outbuilding, institutional records of FFS that had survived the destruction described herein, and those records remained concealed there, within its possession and control as the property's owner, for approximately a decade, never voluntarily disclosed or produced to law enforcement, and were recovered, in part, only upon the execution of a federal

search warrant, as confirmed by law enforcement testimony at Paul Geer's 2025 federal criminal trial, the prosecution of federal sex offenses committed against FFS students.

165. At no time before that recovery did Chapel Hill Land Holdings LLC disclose the existence of those records to any authority, and at no time before or since, including after the 2024 federal indictment of Paul Geer and after his conviction on March 3, 2025, has it made any report or any voluntary disclosure concerning the enterprise whose principal asset it received. The agents who executed the warrant recovered only the files pertaining to the witnesses in the criminal case, and the remaining institutional records, which had plainly been rummaged through before the warrant was executed, were left on the property covered in rodent droppings, where they remain to this day within the possession and control of Chapel Hill Land Holdings LLC, their existence, condition, and disposition never disclosed to any regulator, investigator, or law enforcement agency. In response to Plaintiff's inquiry, the operator of the French Woods camp stated that it had released the institution's records to the Argiros family; pleaded in the alternative, and on information and belief, Chapel Hill Land Holdings LLC released a portion of the surviving records to the Argiros family, the subjects of the enforcement those records concerned, rather than to any authority, and thereby further obstructed that enforcement. Each month of that continued concealment and silence constitutes a fresh act of obstruction within the limitations period.

166. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: the concealment of the documentary record of the enterprise, including, upon information and belief, records concerning Plaintiff's own enrollment, prolonged the concealment that delayed her discovery and assertion of her claims and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C.

§ 1595, including compensatory damages, punitive damages, attorneys' fees, and costs. All applicable limitations periods are tolled as set forth supra.

**COUNT XVIII: OBSTRUCTION OF FORCED LABOR AND LABOR TRAFFICKING ENFORCEMENT BY CONCEALMENT OF RECORDS (18 U.S.C. §§ 1590(b) AND 1595)**

**(Against Chapel Hill Land Holdings LLC)**

167. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

168. 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1590, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

169. Chapel Hill Land Holdings LLC obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590 by harboring on its property, in an outbuilding, the surviving institutional records of the enterprise, including, upon information and belief, records of the operation's labor practices, sanctions, restraints and isolation, finances and billing, and the enrollment of the children whose labor ran it, until the recovery of part of those records by federal law enforcement pursuant to a search warrant, and by retaining the remainder on the property, where they remain to this day, or, pleaded in the alternative and on information and belief, by releasing a portion of them to the Argiros family rather than to any authority, and by making no voluntary disclosure at any time. Its concealment withheld from enforcement the documentary record of the forced-labor operation alleged herein, and no enforcement action under 18 U.S.C. § 1590 has ever been brought against the operation or its principals.

170. Each month of that continued concealment and silence, including following the 2024 federal indictment of Paul Geer and his conviction on March 3, 2025, and continuing through the filing of this action while the remaining records sit on the property, constitutes a fresh act of obstruction within the limitations period. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: the concealment of the documentary record of the enterprise, including, upon information and belief, records concerning Plaintiff's own enrollment, prolonged the concealment that delayed her discovery and assertion of her claims and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs. All applicable limitations periods are tolled as set forth supra.

## COUNT XIX: OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1591(d) AND 1595)

**(Against Jeffrey Brain)**

171. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

172. 18 U.S.C. § 1591(d) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

173. Defendant Jeffrey Brain obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1591. In May 2008, in response to sworn testimony presented in connection with oversight hearings of the United States House of Representatives Committee on Education and Labor describing abuse in residential programs including FFS, the institution issued a public response, of which Defendant Brain was the named contact and, on information and belief,

an author or approving officer, that publicly minimized and mischaracterized the institutional practices alleged in this Complaint. With that knowledge, Brain thereafter continued to direct the school's external relations, admissions, and public marketing, presenting the institution to placing families as a legitimate therapeutic institution and deflecting and burying the publicly aired allegations rather than reporting them, through the school's final years of operation and its 2014 closure.

174. At no time, then or since, including after the 2024 federal indictment of Paul Geer for federal sex offenses committed against FFS students and after his conviction on March 3, 2025, has Brain made any report or disclosure to any authority. Each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period.

175. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: Brain's conduct preserved the public legitimacy on which the enterprise's concealment depended, prolonged the concealment that delayed Plaintiff's discovery and assertion of her claims, and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs. All applicable limitations periods are tolled as set forth supra.

## COUNT XX: OBSTRUCTION OF FORCED LABOR AND LABOR TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1590(b) AND 1595)

**(Against Jeffrey Brain)**

176. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

177. 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1590, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

178. Defendant Jeffrey Brain obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590. In May 2008, in response to sworn testimony presented in connection with oversight hearings of the United States House of Representatives Committee on Education and Labor describing abuse and forced labor in residential programs including FFS, the institution issued a public response, of which Defendant Brain was the named contact and, on information and belief, an author or approving officer, that publicly minimized and mischaracterized the institutional labor practices alleged in this Complaint. With that knowledge, Brain thereafter continued to direct the school's external relations, admissions, and public marketing, presenting the institution to placing families as a legitimate therapeutic institution and deflecting and burying the publicly aired allegations rather than reporting them, through the school's final years of operation and its 2014 closure.

179. At no time, then or since, including after the 2024 federal indictment of Paul Geer and after his conviction on March 3, 2025, has Brain made any report or disclosure to any authority. Each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period.

180. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: Brain's conduct preserved the public legitimacy on which the enterprise's concealment depended, prolonged the concealment that delayed Plaintiff's discovery and assertion of her claims, and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages,

punitive damages, attorneys' fees, and costs. All applicable limitations periods are tolled as set forth supra.

## COUNT XXI: KNOWING BENEFICIARIES OF FORCED LABOR, LABOR TRAFFICKING, AND SEX TRAFFICKING (18 U.S.C. § 1595)

**(Against All Defendants Other Than NBT Bank, N.A., NBT Bancorp Inc., Sysco Corporation, and Sysco Syracuse, LLC)**

181. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

182. The operation of FFS was a venture engaged in violations of 18 U.S.C. §§ 1589, 1590, and 1591, as alleged herein, including the sex trafficking of children in its custody established by the federal criminal conviction of Paul Geer alleged herein. Each Defendant named in this Count knowingly benefited, financially or by receiving anything of value, from participation in that venture, knowing or in reckless disregard of the fact, or in circumstances in which it should have known, that the venture obtained the labor and services of the children in its custody, including Plaintiff, by the unlawful means alleged herein, and that it engaged in the sex trafficking of children in its custody. The benefit each Defendant named in this Count received from Plaintiff's labor was not confined to the period of her enrollment. The product of that labor, including the deck she and other children built and the floors and premises she and other children stripped, waxed, cleaned, and maintained, became part of the campus and the operation's going-concern value, and Defendants continued to possess, use, finance, sell, and profit from it for the remainder of the venture's operation through 2014 and thereafter: Education Plus Corporation and the Argiros Defendants operated the institution on it and pledged it as collateral in 2002, 2004, 2006, 2008, and 2010; Kasos Co Family LP held title to it and sold it in November 2014; Chapel Hill Land Holdings

LLC acquired it and holds it today; and each of the other Defendants named in this Count continued through the venture's operation to receive the benefits alleged herein from an operation whose plant and margin were the accumulated product of the labor of the children who passed through it, including Plaintiff.

183. The benefits received include: as to Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros, the children's labor itself, which ran the institution and displaced the wages a lawful residential school must pay, together with the tuition margins undiminished by labor costs and the charges billed for the restraint and isolation of the children themselves; as to Jeffrey Brain, compensation for their roles in the operation; as to Four Winds, Inc., on information and belief, the consideration, reciprocal referrals and admissions, or discharge-placement capacity it received in return for directing Plaintiff and other adolescent inpatients to FFS; as to Kasos Co Family LP, Kasos Enterprises LLC, Chapel Hill Land Holdings LLC, and K9-5 Inc., real property and successor assets improved, maintained, and built with the unpaid labor of the children, including Plaintiff, including the deck that Plaintiff and other children built; as to the Highlights Defendants, upon information and belief, the portion of the enterprise's tuition-funded money that flowed to them through the integration of their publications into the purported education the venture sold, together with the uncompensated labor of FFS students at their Wayne County retreat; as to Eagle Valley, upon information and belief, the care, maintenance, and training of dogs supported by the unpaid labor of FFS students in the canine operation conducted by its own founder and president from 2000 through 2014; as to Greyhound, the fares paid for Plaintiff's transport to New York City and, on information and belief, for her return, received in the course of its participation in the seizure and return of a child who had fled the venture, together with, on information and belief, the fares of the venture's students and their families traveling on its service

to and from the City; as to The Hancock Herald, revenues derived from its promotional relationship with the operation; as to NATSAP, membership dues paid from the operation's revenues; and as to the Village of Hancock, the Town of Hancock, the County of Delaware, the Delaware County Sheriff's Office, and the Delaware County Board of Supervisors, upon information and belief, the economic benefit of the operation's continuation within their communities, as alleged in Count I.

184. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from the Defendants named in this Count. All applicable limitations periods are tolled as set forth supra.

## COUNT XXII: KNOWING BENEFICIARY OF A FORCED LABOR AND LABOR TRAFFICKING VENTURE (18 U.S.C. §§ 1589(b), 1590, AND 1595)

**(Against NBT Bank, N.A. and NBT Bancorp Inc.)**

185. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

186. The operation of FFS was a venture engaged in violations of 18 U.S.C. §§ 1589 and 1590, as alleged herein. NBT Bank, N.A. knowingly benefited, financially and by receiving things of value, from participation in that venture: it maintained the operation's accounts and those of its principals throughout Plaintiff's enrollment and through the school's 2014 closure, held blanket security interests in the operation's assets, including its tuition receivables and enrollment contracts, extended secured credit to the operation and its property-holding entity, and received fees, interest, and deposit balances swollen by the wages the operation never paid, including in connection with the tuition and charges paid on Plaintiff's behalf. The bank's collateral was, in substantial part, itself the product of the children's labor: the campus real property securing its March 24, 2010 loan to the title-holding family entity, and the equipment, inventory, and improvements swept by its

blanket security interests beginning in 2002, were built, renovated, maintained, and improved by the unpaid labor of the children in the venture's custody, so that the forced labor alleged herein directly enhanced the value of the collateral securing the bank's own position, and the bank held, through its liens, a direct financial stake in the product of that labor. Plaintiff's own labor is part of that collateral: the trailers and the deck she and other children built are permanent structures and improvements on the very real property against which the bank lent and in which it held its security, and the floors and premises she stripped, waxed, and cleaned were the maintenance of that property, so that the bank held a lien on, and profited from, the product of Plaintiff's own forced labor. That benefit was received and continued long after Plaintiff's departure: the bank took its first blanket lien on the operation's assets in 2002, renewed and expanded its secured position in 2004, 2006, 2008, 2010, 2011, and 2013, lent against the campus itself in 2010, collected satisfaction of its credit from the November 2014 conveyance, took the transferee as a secured customer in 2015 under a lien that ran through February 27, 2020, and continued its lien on the operation's own collateral by a continuation filed on September 15, 2016, holding it every day through December 18, 2021, so that the bank was profiting from the product of Plaintiff's labor throughout the venture's operation and through its wind-down.

187. NBT Bank knew, or was in reckless disregard of the fact, or in the circumstances alleged herein should have known, that the venture from which it benefited obtained the labor and services of the children in its custody by unlawful means, for the reasons and on the notice progression set forth in Counts IV and IX supra, including the public record of the operation's unlicensed operation, the knowledge of its Hancock branch manager, Dawn Joyce, who administered the School's accounts and credit and served under the School's president as a director of the corporation the bank sponsored, which is the bank's own knowledge, the secured-lender

knowledge arising from its own collateral position in the operation's receivables and real property, including, upon information and belief, the inspection and appraisal of the campus incident to its secured lending against it, and the financial records that passed through its own ledgers. NBT Bancorp Inc. is liable as its controlling parent as alleged herein.

188. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from the Defendants named in this Count, jointly and severally. All applicable limitations periods are tolled as set forth supra.

## COUNT XXIII: KNOWING BENEFICIARY OF A FORCED LABOR AND LABOR TRAFFICKING VENTURE (18 U.S.C. §§ 1589(b), 1590, AND 1595)

**(Against Sysco Corporation and Sysco Syracuse, LLC)**

189. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

190. The operation of FFS was a single, continuous venture from its founding through its 2014 closure, engaged in violations of 18 U.S.C. §§ 1589 and 1590, as alleged herein, by the same methods and on the same campus throughout, including during Plaintiff's enrollment. Sysco knowingly benefited, financially and by receiving things of value, from participation in that venture. Throughout the relevant period, including throughout Plaintiff's enrollment, Sysco supplied the operation's kitchen on a recurring, scheduled basis, its trucks delivering food and institutional supplies directly to the FFS campus, and it was paid for those goods and deliveries, delivery after delivery, year after year, from the tuition-funded accounts described herein, tuition the operation retained as margin because it paid no wages for the labor the children performed. Sysco's participation was not that of an arm's-length vendor. At each recurring delivery it received

the children's labor itself, without cost, in the unloading of its own trucks by the children of the institution, without any adult labor crew in their place. Plaintiff was among those children assigned to that labor: Plaintiff personally received the distributor's goods as they were unloaded from its trucks and carried them into the institution's freezer and storage areas, working directly alongside and in the immediate presence of Sysco's drivers and delivery personnel, who returned to the campus on a regular delivery schedule and repeatedly observed Plaintiff and other minor children performing that labor. The benefits Sysco received were thus twofold and direct: years of recurring institutional sales revenue paid from the proceeds of the venture, and the children's unloading labor, including Plaintiff's, received at the truck at every delivery.

191. Sysco knew, or was in reckless disregard of the fact, or in the circumstances alleged herein should have known, that the venture from which it benefited obtained the labor and services of the children in its custody by unlawful means. Its knowledge was of a different character from that of any other Defendant: not financial inference but direct physical observation. Sysco's own delivery personnel were on the campus at every delivery, taking the work of children's hands off Sysco's own trucks, and Sysco's own delivery volume showed that it was provisioning an institutional kitchen for hundreds of residents that, on its employees' own observation, was stocked and staffed by the children it was feeding. That knowledge, acquired by Sysco's employees in the course of their duties, is the knowledge of Sysco. Sysco made no inquiry, no report, and no disclosure to any authority at any time, and continued to supply the operation, to accept payment from it, and to accept the children's unloading labor throughout.

192. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover his damages and reasonable attorneys' fees from Sysco

Corporation and Sysco Syracuse, LLC, jointly and severally. All applicable limitations periods are tolled as set forth supra.

**COUNT XXIV: CIVIL REMEDY FOR PERSONAL INJURIES (18 U.S.C. § 2255)**

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)**

193. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

194. Plaintiff, while a minor, was a victim of violations of 18 U.S.C. §§ 2251 and 2252. During Plaintiff's June 1996 intake, as described herein, Defendant Education Plus Corporation, acting through the staff who carried out the uniform intake policy that it and Defendants Betty Argiros, Emmanuel Argiros, and Cindy Argiros adopted, directed, and enforced, and through the staff members who performed and directed the photography, whose identities are within Defendants' knowledge, used and employed Plaintiff, then a sixteen-year-old minor, in the production of a visual depiction of Plaintiff taken in the course of and as part of the intake strip search described herein, immediately after that search and before Plaintiff had been permitted to dress, which, on information and belief, depicted Plaintiff unclothed, in violation of 18 U.S.C. § 2251. The photograph was produced using photographic film, cameras, and materials that had been mailed, shipped, and transported in interstate and foreign commerce. On information and belief, the photograph of Plaintiff, together with the other images produced under the institutional photography practice described herein, was placed directly into a book maintained by the institution and was knowingly retained and possessed by Defendant Education Plus Corporation through at least FFS's 2014 closure, in violation of 18 U.S.C. § 2252, and the photograph itself

remains within the books the institution retained, within Defendants' possession or control. Defendants acted in concert with one another in the adoption and execution of that practice.

195. As a direct and proximate result of those violations, Plaintiff suffered personal injuries as alleged herein, including the injuries arising from the strip search, the photography, and the institution's retention of that image of her. Pursuant to 18 U.S.C. § 2255, Plaintiff is entitled to recover her actual damages, and in any event liquidated damages in the amount provided by 18 U.S.C. § 2255 of no less than $150,000, together with the cost of the action and reasonable attorneys' fees. This Count is subject to no limitations period, and all applicable limitations periods are in any event tolled as set forth supra.

## COUNT XXV: GENDER-MOTIVATED VIOLENCE (N.Y.C. ADMIN. CODE § 10-1101 ET SEQ.)

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)**

196. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

197. The New York City Victims of Gender-Motivated Violence Protection Law, N.Y.C. Administrative Code § 10-1101 et seq., provides a civil cause of action to any person injured by a crime of violence motivated by gender, that is, by an act or series of acts that would constitute a misdemeanor or felony against the person under state or federal law, presenting a serious risk of physical injury, and committed because of gender or on the basis of gender, due at least in part to animus based on the victim's gender, whether or not those acts resulted in criminal charges, prosecution, or conviction. As amended by the City of New York in 2026, the law provides that cause of action, including under N.Y.C. Administrative Code § 10-1104.1 for crimes of violence

motivated by gender that occurred on or before December 19, 2000, against any party who commits, directs, enables, participates in, or conspires in the commission of such a crime of violence, and authorizes compensatory and punitive damages, injunctive and declaratory relief, and attorneys' fees and costs.

198. Plaintiff was the victim of a series of crimes of violence motivated by gender committed, directed, enabled, and participated in by the Defendants named in this Count. Those acts include: the intake strip search of June 1996, the first thing done to Plaintiff upon her arrival from a psychiatric hospital, in which Plaintiff, a sixteen-year-old girl, was made to strip naked in a classroom adjoining the institution's office, before female students acting at staff direction and a staff member who came in and out of the room, and to squat and cough; the photographing of Plaintiff in the course of that search, before she had been permitted to dress; the physical restraint of Plaintiff by staff and by senior students acting at their direction, her binding in blankets with duct tape, and her confinement so bound for days at a time without access to a toilet; the forced feeding of Plaintiff with fish to which she was allergic and the half portions imposed on her when she gained weight; the seizure of Plaintiff in the City of New York by means of the institution's photograph, her return to the institution, and the strip search to which she was subjected upon that return; the sexually explicit conversation to which adult staff subjected her; the staff-run "table topics" sessions at which staff raised and used against her the sexual assault she had suffered before her enrollment; and the sanction under which she was made to cut her hair to her chin because staff regarded it as vanity. Each of those acts would constitute a misdemeanor or felony against the person under the laws of the State of New York, including unlawful imprisonment, assault, endangering the welfare of a child, coercion, and the use of a child in a sexual performance, and each presented a serious risk of physical injury to Plaintiff, a confined child.

199. Those acts were committed because of Plaintiff's gender and on the basis of her gender, due at least in part to animus based on her gender. The institution's regime of control was directed at Plaintiff's body, appearance, and sexuality as a female adolescent: it stripped and inspected her and photographed her unclothed; it barred her from any contact with male students for the entirety of her enrollment, a prohibition imposed by family head Paul Geer within three days of her arrival; it prohibited her from wearing makeup or jewelry and imposed dress-down sanctions directed at her appearance as a girl; it subjected her, through adult staff, to sexually explicit conversation and, at table topics, to the use against her of the sexual assault she had disclosed; it made her cut her hair as a punishment for vanity; it policed her weight through half portions; and it punished her resistance to that regime by binding her in blankets and duct tape and isolating her. That course of conduct treated the body of a girl in the institution's custody as an object of institutional surveillance, exposure, and correction, and reflected, and was carried out with, contempt for Plaintiff as a girl.

200. The Defendants named in this Count committed, directed, enabled, and participated in those crimes of violence. Defendants Education Plus Corporation and Betty Argiros adopted, directed, and enforced the intake and re-entry search and photography policy, the restraint and isolation practice, the food punishments, the blackout and dress-down practices, and the runaway-recovery practice under which each act was committed; Defendants Emmanuel Argiros and Cindy Argiros, in the leadership of the institution throughout Plaintiff's enrollment, directed and participated in their administration; and the staff members and senior students who personally carried them out, whose identities are within Defendants' knowledge, acted at these Defendants' direction. Each such Defendant additionally enabled and participated in those acts by the conduct through which the venture obtained Plaintiff from the City of New York and held her. That conduct was a single, continuous course of trafficking that began in the City and ended on the campus. Its steps were

these: the venture cultivated a referral network of hospitals and clinicians, including Defendant Four Winds and Stony Lodge Hospital, which, on information and belief, directed numerous children to FFS; it marketed itself to Plaintiff's Staten Island family through representations that it was a licensed, staffed therapeutic institution with psychiatrists on its staff; it drew its payment for her, on information and belief, by checks mailed from Staten Island, New York City; it took her directly from a psychiatric hospital into its custody; and, as the first act performed upon her on the campus, it stripped her, inspected her, and photographed her. The recruitment, the funding, and the transport were not preliminaries to the gender-motivated violence; they were the means by which the venture obtained a girl on whom to commit it, and the strip search was the venture's first exercise of the custody those means had procured. The same course of conduct was renewed within the City of New York: when Plaintiff fled the campus and reached the City, the venture, by means of the photograph it had taken of her and its report to the police, caused her to be seized at the Port Authority Bus Terminal in Manhattan, handcuffed, held, and returned from the City to the campus, where she was stripped and searched again. The girl obtained from Staten Island was re-obtained from the City of New York and stripped and searched again upon her return. The gender-motivated violence committed upon Plaintiff was thus set in motion and funded within the City of New York, was committed upon her as the immediate and intended consequence of her removal from the City, and was renewed by her seizure within the City and her return from it, and its victim was, at the time, a resident of the City of New York.

201. This action is commenced within the revival period established by the City of New York's 2026 amendment of the Victims of Gender-Motivated Violence Protection Law, N.Y.C. Administrative Code §§ 10-1104.1 and 10-1105, under which a claim under this law arising from conduct that occurred on or before December 19, 2000, or after that date and before January 9,

2022, may be commenced through July 29, 2027, regardless of any limitations period that would otherwise apply. This claim is additionally timely under CPLR 208(b) and on the tolling and estoppel grounds set forth supra.

202. As a direct and proximate result of that gender-motivated violence, Plaintiff suffered the injuries described herein and is entitled to compensatory and punitive damages, injunctive and declaratory relief, and attorneys' fees and costs pursuant to N.Y.C. Administrative Code §§ 10-1104 and 10-1104.1, against the Defendants named in this Count, jointly and severally.

## COUNT XXVI: GENDER-MOTIVATED VIOLENCE (N.Y.C. ADMIN. CODE § 10-1101 ET SEQ.)

**(Against the Village of Hancock, New York, individually and through the Village of Hancock Police Department)**

203. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein. The provisions of the New York City Victims of Gender-Motivated Violence Protection Law set forth in Count XXV apply to this Count.

204. The Village of Hancock, through Hancock PD, enabled and participated in the crimes of violence motivated by gender alleged in Count XXV. On information and belief, upon the institution's report of Plaintiff's flight, Hancock PD received from the institution the photograph it had taken of Plaintiff on the day of her intake strip search; its officers searched for Plaintiff in Hancock that night, at and around the stop for the commercial bus service to New York City, where Plaintiff saw them; and, having failed to find her and knowing that she was from the City of New York, Hancock PD transmitted that photograph and an alert to police in the City of New York, including transit police, so that Plaintiff would be intercepted on her arrival and returned to the

institution. That act procured the seizure of Plaintiff, a sixteen-year-old girl, at the Port Authority Bus Terminal in Manhattan, her handcuffing and detention there, and her transport back to the institution, where, as the immediate and intended consequence of her return, she was strip searched again and returned to the regime of restraint, isolation, and gender-based control described herein.

205. Hancock PD acted pursuant to the standing runaway-recovery arrangement described herein, under which it used the intake photographs the institution supplied to it to locate and return to the institution the children who fled it. On information and belief, Hancock PD knew, from that standing arrangement and from the official notice of the institution's unlicensed operation described herein, that the institution to which it returned those children operated without the license New York law required, and that children returned to it were subjected upon their return to the institution's intake and re-entry practices, including strip searches; and it made no inquiry into why a sixteen-year-old girl had fled to the City of New York or into what awaited her on her return. The seizure and return Hancock PD procured were the means by which the crimes of violence committed upon Plaintiff on her return were carried out, and the seizure itself, committed within the City of New York upon a girl fleeing the regime described herein, was part of the series of acts constituting those crimes of violence.

206. The acts the Village of Hancock enabled and participated in were committed because of Plaintiff's gender and on the basis of her gender, due at least in part to animus based on her gender, for the reasons set forth in Count XXV, and the act the Village procured occurred within the City of New York.

207. This action is commenced within the revival period established by the City of New York's 2026 amendment of the Victims of Gender-Motivated Violence Protection Law, N.Y.C.

Administrative Code §§ 10-1104.1 and 10-1105, under which a claim under this law arising from conduct that occurred on or before December 19, 2000 may be commenced through July 29, 2027, regardless of any limitations period that would otherwise apply. This claim is additionally timely under CPLR 208(b) and on the tolling and estoppel grounds set forth supra.

208. As a direct and proximate result of that gender-motivated violence, Plaintiff suffered the injuries described herein and is entitled to compensatory and punitive damages, injunctive and declaratory relief, and attorneys' fees and costs pursuant to N.Y.C. Administrative Code §§ 10-1104 and 10-1104.1, against the Village of Hancock, individually and through the Village of Hancock Police Department.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff M.P. respectfully demands judgment against Defendants, jointly and severally, as follows:

(A) Compensatory damages in an amount to be determined at trial, and in no event less than $5,000,000, including the cost of past and future medical, psychiatric, and therapeutic care, lost earnings and earning capacity, the value of the uncompensated labor extracted from Plaintiff, and restitution of all tuition and charges paid;

(B) Treble damages pursuant to 18 U.S.C. § 1964(c) on Plaintiff's RICO claims, in no event less than $15,000,000;

(C) Punitive damages in an amount sufficient to punish Defendants for their willful, malicious, and egregious conduct and to deter similar conduct in the future;

(D) Attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c), 18 U.S.C. § 1595, N.Y. Social Services Law § 483-bb(c), 18 U.S.C. § 2255, N.Y.C. Administrative Code §§ 10-1104 and 10-1104.1, and all other applicable statutes;

(E) Pre-judgment and post-judgment interest at the maximum rate permitted by law;

(F) Declaratory and injunctive relief as appropriate, including pursuant to N.Y.C. Administrative Code § 10-1104 and the setting aside of the fraudulent conveyances alleged herein; and

(G) Any and all other relief this Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: Brooklyn, New York
September 30, 2026

Respectfully submitted,

JOHANNESEN & UMANA, P.C.

*Attorneys for Plaintiff*

By: ______________________________

Elizabeth Sarah Johannesen, Esq.

*Founding Partner*

68 Jay Street, Suite 225

Brooklyn, New York 11201

P: (631) 559-1018

elizabethsarahjohannesen@esjlaw.info

**VERIFICATION**

STATE OF FLORIDA )
) ss.:
COUNTY OF VOLUSIA )

I, M.P., am the Plaintiff in the above-captioned action. I have read the foregoing Verified Complaint and know the contents thereof. The contents are true to my own knowledge, except as to matters alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on: 10/1/26

____________________________
M.P.